NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0237n.06

No. 09-6100

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Apr 15, 2011*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| MARY BRASWELL, as conservator of FRANK D. HORTON, individually, | ) ) ) | |
| Plaintiff-Appellant, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| v. | ) ) ) | COURT FOR THE MIDDLE DISTRICT OF TENNESSEE |
| CORRECTIONS CORPORATION OF AMERICA, | ) ) | |
| Defendant-Appellee. | ) ) | |

BEFORE: BATCHELDER, Chief Judge; KEITH and ROGERS, Circuit Judges.

ROGERS, Circuit Judge.  Mary Braswell, the conservator of prisoner Frank D. Horton, appeals a grant of summary judgment to Corrections Corporation of America (CCA) in this 42 U.S.C. § 1983 suit claiming that CCA violated Horton's Eighth Amendment rights by, among other things, not removing him from a squalid cell for nine months.  Reversal is required because there is a genuine issue of material fact as to (1) whether administrative remedies were available to Horton, *see* 42 U.S.C. § 1997e(a), (2) whether Horton's injuries met the "physical injury" requirement of § 1997e(e), and (3) whether a CCA policy or custom caused the alleged Eighth Amendment violations.

I

Viewed in the light most favorable to Braswell, these are the essential facts. Horton was previously confined at the Metro Davidson County Detention Facility, a prison operated by CCA under a contract with the Metropolitan Government of Nashville and Davidson County, Tennessee. When Horton arrived at the detention facility on December 9, 2005, he had a history of psychiatric treatment and was considered a special needs inmate. Because of behavioral problems, he was placed in the segregation unit, where he was isolated from most of the prison population.

Prior to May 2007, CCA personnel used force against Horton on several occasions—sometimes to stop him from fighting with other inmates, sometime to extract him from his cell. According to CCA incident reports, prison guards used pepper spray to separate Horton from another inmate in January 2006, and again in February 2006. On both occasions, Horton sustained minor injuries and was treated by CCA medical staff.

Sometime after April 2006, Horton began remaining in his cell for multiple days at a time. Despite being given daily opportunities to shower and exercise—in accordance with CCA policy—Horton refused to exit his cell for increasingly lengthy periods of time. On January 26, 2007, CCA employees were authorized to force Horton out of his cell so that he could take a shower and receive a mental health evaluation. Horton initially refused verbal commands to submit to restraints, but after inflammatory agents were released inside his cell, he complied and was taken to the shower. His cell was then cleaned and decontaminated. It is not clear from the record how many times this process was repeated prior to May 2007.

After Assistant Warden Michael Corlew started work at the detention facility in May 2007, however, CCA personnel intentionally stopped the practice of extracting Horton from his cell. Corlew instructed the officers that the use of force would be reserved for emergencies only. CCA maintained activity records for each prisoner, and prison guards would simply mark "refused" after Horton declined daily opportunities to come out of his cell. At the same time, CCA personnel refused to give Horton cleaning supplies because they were afraid of what he might do with them.

Patrick Perry, an officer at the detention facility from August 2006 to January 2008, began to notice that something was wrong late in 2007. In January 2008, Perry attempted to communicate with Horton, but Horton was speaking "gibberish." Perry testified that Horton's cell was filthy, that there were several food trays on the floor and bacteria growing in the toilet, that Horton's beard and hair were "matted" and "out of control," and that it appeared Horton had not washed himself or had his cell cleaned for months.

Perry obtained Horton's activity records and realized that Horton had not left his cell since May 2007—a period of nine consecutive months. Perry took copies of those records, along with photographs he had taken of Horton's cell, to the detention facility's quality assurance manager. When nothing was done, Perry blew the whistle: he brought Horton's records to the Davidson County Health Department on January 31, 2008. Perry was fired that same day, and the Health Department sent an employee to investigate Horton's condition.

By court order, Horton was transferred out of CCA's detention facility on April 11, 2008. He received a mental health due process hearing on April 29, 2008, and the following day was

transferred to the Lois DeBerry Special Needs Facility, where he was diagnosed with schizophrenia. After he arrived at the special needs facility and began receiving mental health treatment, Horton's condition improved

Braswell filed her complaint on July 16, 2008, alleging that CCA violated Horton's Eighth Amendment rights by failing to provide him with mental health care, subjecting him to inhumane conditions of confinement, and failing to protect him from other inmates and CCA employees.[1] CCA moved to dismiss, arguing that Braswell had not exhausted available administrative remedies, did not show that Horton sustained a physical injury, and could not maintain claims against CCA under a theory of vicarious liability.

The district court converted CCA's motion to dismiss into a motion for summary judgment and ruled in favor of CCA. The court found that administrative remedies were unavailable after Horton could no longer speak coherently, and that they remained unavailable after Horton was transferred to the special needs facility because Horton was no longer in the custody of CCA or subject to its grievance process. However, the court found that all of Braswell's claims were barred because she failed to make the required showing of physical injury. Finally, the district court noted that Braswell had "articulate[d] evidence that could suggest a CCA policy regarding Plaintiff's Eighth Amendment claims," but did not reach that issue. This appeal followed.

II

---

[1]The complaint also asserted First Amendment claims alleging that CCA tampered with Horton's mail. Braswell does not appeal the district court's grant of summary judgment in favor of CCA on those claims.

Three obstacles confront Braswell's ability to advance Horton's Eighth Amendment claims in federal court. First, the PLRA requires a prisoner to exhaust "such administrative remedies as are available" before filing suit under § 1983. 42 U.S.C. § 1997e(a). Second, the PLRA bars prisoner suits "without a prior showing of physical injury." 42 U.S.C. § 1997e(e). And third, because Braswell is suing CCA and not individual corrections officers, she must show that a CCA "policy or custom" caused the alleged violation of Horton's Eighth Amendment rights. *See Monell v. City of New York Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978). At this stage of the proceeding, Braswell has produced enough evidence to surmount all three obstacles.

A

As the district court found, there is a genuine factual dispute as to whether any administrative remedies were "available" to Horton during his confinement at the CCA detention facility and after his transfer to the special needs facility. Despite the existence of a grievance system at the detention facility, the evidence raises a question about whether Horton was capable of availing himself of those remedies given his mentally impaired condition.

Section 1997e(a) requires a prisoner to exhaust "such remedies as are available." 42 U.S.C. § 1997e(a). The plain meaning of the term "available" is that a prisoner is required to exhaust only those procedures that he is reasonably capable of exhausting. *See Hoover v. West*, 93 F. App'x 177, 181 (10th Cir. 2004) (citing *Underwood v. Wilson*, 151 F.3d 292, 295 (5th Cir.1998)). Section 1997e(a) is an affirmative defense. *Jones v. Bock*, 549 U.S. 199, 216 (2007). CCA must accordingly demonstrate that its administrative remedies were "available" to Horton, meaning not only that

- 5 -

Horton had access to CCA's administrative grievance process in the segregation unit where he was being held, but also that he was actually *capable* of filing such a grievance. *See Brown v. Valoff*, 422 F.3d 926, 936-37 (9th Cir. 2005).

Braswell has raised a genuine issue of material fact as to whether CCA has met that burden. First, given the alleged deterioration of Horton's mental state, there is some doubt that Horton even knew that he needed mental health treatment—much less that he needed to communicate that need to CCA personnel. Warden Brian Gardner testified that inmates in need of psychiatric care are not always aware that they require specialized treatment. It is thus not clear that Horton was even aware of his need for the mental health treatment he did not request, to say nothing of his ability to understand the detention facility's grievance process for requesting such treatment.

Second, there is substantial doubt as to whether Horton was mentally capable of filing a grievance. "[O]ne's personal inability to access the grievance system could render the system unavailable." *Days v. Johnson*, 322 F.3d 863, 867 (5th Cir. 2003). In *Days*, the prisoner argued that his failure to file a grievance should be excused because he had suffered a broken right hand that rendered him unable to fill out the prison's grievance form. *Id.* at 864. The Fifth Circuit agreed that the prisoner's failure to exhaust should be excused, at least where the prisoner's subsequent attempt to exhaust was rejected on timeliness grounds, recognizing that the exhaustion requirement may be subject to equitable defenses. *Id.* at 868; *see also Pavey v. Conley*, 544 F.3d 739, 740 (7th Cir. 2008). Likewise, the district court in *Johnson-Ester v. Elyea*, No. 07-CV-4190, 2009 WL 632250, at *6 (N.D. Ill. Mar. 9, 2009), reasoned that a disabling mental illness may also render administrative

remedies "unavailable," such that efforts by family members were sufficient to meet the underlying notice purpose of the PLRA. *See Porter v. Nussle*, 534 U.S. 516, 524-25 (2002).

Third, even if Horton had been capable of filing a grievance, there is doubt as to whether Horton sufficiently understood the detention facility's grievance system or had access to the necessary forms. To initiate CCA's grievance procedure, an inmate must first fill out and submit an "information request form" to request an informal discussion with CCA personnel. No CCA official offered to give Horton a request form, even though at least one person was aware that Horton's mental condition was deteriorating as early as July 2007. CCA argues that a request form would have been given to Horton had he asked for one. Yet according to Perry, the only way Horton would have known that he needed to fill out a request form would be from watching other inmates go through the process, which may have been impossible for a segregated prisoner to observe.

To compound these difficulties, Perry testified that there would often be no request forms available in the segregation unit. Short of "beat[ing] on the door" and "maybe [getting] the right person now and then," it is not clear that Horton would have been able to receive the request form necessary to initiate a grievance in a timely manner. A prisoner may lack available remedies when prison officials deny him the necessary grievance forms or fail to provide access to grievance forms. *Mitchell v. Horn*, 318 F.3d 523, 529 (3d Cir. 2003). Even if Horton had been able to communicate his needs informally to CCA personnel, the prison's grievance policy would then have required him to file a formal grievance by placing a grievance form in the "grievance mail box." But Horton

would have been unable to do this, because he refused to leave his cell and CCA personnel did not forcibly extract him for nine months.

Finally, as the district court found, there is also doubt as to whether Horton remained subject to CCA's grievance system once he was transferred to the special needs facility. CCA does not allege that its grievance process was available to Horton at the time Braswell filed her complaint, while Horton was being treated in the special needs facility. By its own terms, the CCA Grievance Policy applies only to "inmates/residents" of a CCA facility—not former prisoners who are no longer in CCA custody. The district court therefore correctly determined that these remedies remained unavailable to Horton after his transfer to the special needs facility. *See Bradley v. Washington*, 441 F. Supp. 2d 97, 102-03 (D.D.C. 2006).

For all of these reasons, the existing record does not permit a conclusion that the remedies Horton failed to exhaust were available to him for purposes of § 1997e(a). As the district court found, there is a material factual dispute as to whether CCA's grievance process was available to Horton during his confinement at the detention facility and after his transfer to the special needs facility.

B

Contrary to the district court's finding, however, the existing record does not support a conclusion that the physical injuries allegedly sustained by Horton were de minimis. *See Flanory v. Bonn*, 604 F.3d 249, 254 (6th Cir. 2010). The PLRA bars prisoner suits "for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e).

There is no statutory definition of "physical injury" as used in § 1997e(e). However, we have indicated that while the requisite physical injury need not be significant, it must be more than de minimis. *Flanory*, 604 F.3d at 254.

Taking the facts in the light most favorable to Braswell, Horton sustained a number of nontrivial physical injuries as a result of CCA's failure to forcibly remove him from his cell. According to Perry's testimony, Horton was left in a disgustingly unsanitary cell for nine consecutive months, without a shower or an opportunity to exercise. Perry testified that the cell was filthy, that there was mold growing in the toilet, that the cell floor was littered with food trays, and that the window in Horton's cell was covered, blocking out all natural sunlight.

The physical injuries Braswell alleges are similar in kind and degree to other injuries that have been found to violate a prisoner's Eighth Amendment rights—and *a fortiori* to satisfy the PLRA's "more than de minimis" physical injury requirement. For example, this court has said that claims of excessive cold or dampness in a prison constitute Eighth Amendment violations, without even addressing whether such claims rise above the PLRA's de minimis standard. *See Spencer v. Bouchard*, 449 F.3d 721, 728 (6th Cir. 2006); *Franklin v. Franklin*, 215 F.3d 1326, at *4 (6th Cir. 2000) (unpublished table decision). Likewise, a denial of exercise for an extended period of time has been held to constitute more than a de minimis physical injury. *Williams v. Goord*, 111 F. Supp. 2d 280, 291 (S.D.N.Y. 2008). Consistent with these cases, a claim that a prisoner has languished in a filthy and unsanitary cell for nine consecutive months asserts more than a de minimis physical injury.

The PLRA's physical injury requirement weeds out frivolous claims where only emotional injuries are alleged. *E.g.*, *Cox v. Malone*, 199 F. Supp. 2d 135, 140 (S.D.N.Y. 2002). At this stage of the case, Braswell has cleared that hurdle. There is a material factual dispute as to whether the allegedly inhumane conditions of Horton's confinement exceed the PLRA's de minimis threshold for legitimate Eighth Amendment claims.

C

Finally, there is a genuine issue of material fact as to whether a CCA policy or custom was responsible for the alleged violation of Horton's Eighth Amendment rights. The district court did not reach this issue because it dismissed the suit in part for failure to exhaust administrative remedies and in part for failure to show a physical injury. The court noted, however, that Braswell "articulates evidence that could suggest a CCA policy regarding Plaintiff's Eighth Amendment claims."

This appears correct. A private corporation that performs the traditional state function of operating a prison acts under color of state law for purposes of § 1983. *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir.1996). However, CCA cannot be held liable under a theory of respondeat superior. *See Monell*, 436 U.S. at 691-92. To prevail in a § 1983 action against CCA, Braswell must show that a policy or well-settled custom of the company was the "moving force" behind the alleged deprivation of Horton's rights. *See Miller v. Sandilac*, 606 F.3d 240, 254-55 (6th Cir. 2010). For purposes of withstanding a motion for summary judgment, Braswell had made such a showing.

Braswell presented testimony from which a jury could infer that CCA had a policy or custom of not using force against prisoners, and that this policy or custom caused Horton to be left in his cell

for nine months. First, there was evidence that CCA had a policy or custom of limiting uses of force to emergencies only. Warden Brian Gardner testified that CCA policy was to use the minimum amount of force necessary to resolve inmate situations. Gardner testified that CCA maintained records of each use of force incident, that officers had to forward incident reports to CCA's corporate office, and that use-of-force incidents could be used to determine annual bonuses and pay raises for CCA employees. Viewing the evidence in the light most favorable to Braswell, CCA corrections officers thus had both a carrot and a stick—an incentive to minimize uses of force, and a corporate policy requiring them to do so.

Because of this policy, inmates that needed to be restrained and forcibly medicated were left untreated for excessive periods of time. Horton was not the only inmate affected by this policy. Perry testified that one inmate would run from the back of his cell to the front and repeatedly bang his head against the door. The inmate would put his mattress against the door, flood his cell with the toilet until the water was ankle deep, and throw feces against the wall. CCA personnel waited nearly two weeks before giving him medication to calm him down. Another inmate exhibited similar psychotic behavior, running into the cell door with his head. One night he attempted to commit suicide by suffocating himself with a paper gown. Despite Perry's anguished requests for permission, CCA personnel refused to place the inmate in restraints and forcibly medicate him. Instead, the inmate was transferred to a holding cell in the coldest area of the prison, where he remained naked without a blanket for at least two weeks during the winter months of 2007.

Second, there was evidence that this use-of-force policy caused the alleged deprivation of Horton's Eighth Amendment rights. To provide medical care to Horton, Braswell maintains, CCA would have needed to use force to remove Horton from his cell or to restrain him to administer medication. But any time an inmate had to be forcibly extracted from his cell, officers had to record the incident as a "use of force," and forward the incident report to the CCA corporate office. Perry testified that prior to the arrival of Assistant Warden Corlew in May 2007, an inmate would not have been allowed to refuse to come out of his cell for more than a few days at a time, because CCA's policy was that inmates were to regularly shower and clean their cells. Indeed, according to Perry, before Corlew arrived at the detention facility, Horton had been forcibly removed from his cell several times in order to have his cell cleaned, give him a haircut, and force him to take a shower.

All that changed, according to Perry, when Corlew started work in May 2007. Perry testified that Corlew "put the word out that we would not be using force under any, under any—unless it was an emergency," and that any emergencies would be deemed the fault of CCA personnel. The need to clean Horton's cell and give him a shower was not an emergency that warranted a cell extraction. CCA personnel simply marked "refused" after Horton declined daily opportunities to come out of his cell—day after day, until the days turned into months. This is sufficient evidence from which a jury could find that CCA's newly instated policy of limited uses of force caused the alleged deprivation of Horton's Eighth Amendment rights.

Viewing the evidence in the light most favorable to Braswell, a jury could find that this practice "reflect[s] a course of action deliberately chosen from among various alternatives." *Doe v.*

*Claiborne Cnty.*, 103 F.3d 495, 508 (6th Cir. 1996) (citing *City of Oklahoma v. Tuttle*, 471 U.S. 808, 823 (1985)). After Corlew took over at the detention facility, CCA could have continued to forcibly extract Horton from his cell in order to give him a shower and clean the cell. A jury could find that CCA instead deliberately chose to reserve the use of force for "emergencies."

Braswell has also presented evidence from which a jury could find that Corlew's directives had become a "deeply embedded traditional way[] of carrying out . . . policy." *Doe*, 103 F.3d at 507. Perry's testimony suggests that CCA's failure to forcibly treat prisoners was not limited to Horton's case. Given the examples of other inmates who were left untreated for excessive periods of time, a jury could find that CCA's practice of limiting the use of force was an ongoing and widespread pattern throughout the detention facility. There is therefore a material factual dispute as to whether a policy or custom of CCA caused the alleged deprivation of Horton's Eighth Amendment rights.

D

It may be that further development of the record will indicate that administrative remedies were available to Horton, or that the physical injuries he sustained were de minimis, or that the alleged Eighth Amendment violations he endured were not caused by a CCA policy or custom. At this stage of the case, however, it is sufficient that the evidence, viewed in the light most favorable to Braswell, creates a material factual dispute on these points.

III

For these reasons, we reverse the district court's grant of summary judgment.

**ALICE M. BATCHELDER, Chief Judge, dissenting.** Frank Horton's situation is a sympathetic one. The neglect and lack of care he received while incarcerated is disturbing and Braswell's crusade to seek justice for him is compelling. However, I cannot ignore the fact that Braswell has sued the wrong party. I respectfully dissent from the majority's opinion.

It is well established that there is no respondeat superior liability under 42 U.S.C. § 1983. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691–92 (1978); *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). A plaintiff must sue the actual individuals acting "under color of [law]" responsible for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. However, a municipality (or in this case, a private corporation acting under color of state law) can be held liable for its unconstitutional policies or customs. *Miller v. Sanilac Cnty.*, 606 F.3d 240, 254–55 (6th Cir. 2010); *Little v. Corrections Corp. of Am.*, 103 F. App'x 898, 900 (6th Cir. 2004) (applying § 1983 to corporate defendant acting under color of state law). "Policy" and "custom" are two distinct concepts. *See Ford v. Cnty. of Grand Traverse*, 535 F.3d 483, 496 (6th Cir. 2008) ("[W]e note that § 1983 municipal-liability jurisprudence distinguishes between 'policy' and 'custom.'"). A policy refers to the "policies promulgated by the official vested with final policymaking authority for the municipality." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 813 (6th Cir. 2005). A custom, on the other hand, refers to an informal rule or way of doing things that "has not received formal approval through . . . official decisionmaking channels." *Monell*, 436 U.S. at 690–91. The custom must "be so permanent and well settled as to constitute a custom or usage with the force of law." *Id.* at 691

(internal quotation marks and citation omitted).  It must reflect a "[d]eeply embedded traditional way[] of carrying out . . . policy."  *Doe v. Claiborne Cnty.*, 103 F.3d 495, 507 (6th Cir. 1996).

Most importantly, the proper policymaking officials must acknowledge and acquiesce in the custom.  *See Paige v. Coyner*, 614 F.3d 273, 284 (6th Cir. 2010) ("[P]olicy or custom does not have to be written law; it can be created 'by those whose edicts or acts may fairly be said to represent official policy.'"); *Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009) ("A municipality can be shown to have a 'custom' causing constitutional violations, even if that custom was not formally sanctioned, provided that the plaintiff offers proof of policymaking officials' knowledge and acquiescence to the established practice."); *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) ("A city's custom or policy can be unconstitutional in two ways:  1) facially unconstitutional as written or articulated, or 2) facially constitutional but consistently implemented to result in constitutional violations with *explicit or implicit ratification by city policymakers*."  (emphasis added)); *Memphis, Tenn. Area Local, Am. Postal Workers Union, AFL-CIO v. City of Memphis*, 361 F.3d 898, 902 (6th Cir. 2004) ("A municipal 'custom' may be established by proof of the knowledge of policymaking officials and their acquiescence in the established practice.").  While the language in these cases appears to be permissive, sometimes stating that custom "may" or "can" be established in this way, it is clear that this is a required element.  *See Monell*, 436 U.S. at 694 ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.").  In short, there must be at least knowledge and acquiescence by the

official policymakers of the municipality or corporation. Requiring anything less would devolve into establishment of respondeat superior liability.

Braswell's case fails because she has done nothing to connect any possible unconstitutional custom at the prison to the defendant Corrections Corporation of America ("CCA"). Braswell's only plausible argument for the existence of a custom is that Assistant Warden Corlew instituted an informal policy that force would not be used except in emergency situations, and that the need to extract Horton from his cell for cleaning, hygiene, and mental health evaluation did not constitute an emergency situation. Officer Perry stated that "There was a constant cessation of the use of force on all inmates after [Assistant] Warden Corlew got there [in May 2007]." R.23-7 (Perry Dep.) at 24. Perry explained, "Corlew put the word out that we would not be using force under any, under any—unless it was an emergency, and then if the emergency occurred, it was still our fault and we'd still catch an ass chewing from it." *Id.* at 22. But when asked whether or not Corlew explicitly stated any of that, Perry admitted, "He never put it out there like that, sir, but from the time he got there it was understood. It was one of them [sic] things where you all have lost control over this facility, I am here to put control back into this facility. All the cowboys, people that think they want to do it their way, can hit the door." *Id.* Elsewhere, Perry testified that, "it was told to us that we were the top facility in the . . . division for uses of force and that all uses of force was [sic] supposed to come down. I mean, there was supposed to be no force used unless it was the absolute last resort." *Id.* at 6. Perry does not identify the source of this message.[1] But Perry later states that Corlew talked

---

[1]Normally, one would think of the goal of reducing uses of force in a prison as a laudable one.

about the official, written CCA policy all the time, constantly emphasizing it, making sure it was followed at all times. *Id.* at 49. The official, written policy explicitly authorized uses of force for certain circumstances, while stating the steps that should be taken prior to using force to address a situation. *See infra.* Following the written policy would not require a total cessation of the use of force.

Even assuming that Corlew's directions amounted to a new, deeply embedded, unconstitutional way of doing things, what is ultimately fatal to Braswell's claim is that she makes no connection between Corlew's supposed new custom and the corporate defendant, CCA. Braswell does not submit any evidence that CCA had given official policymaking power to Corlew. She does not allege that any other officials above Corlew even knew about his new custom.[2] She does not even allege that Warden Gardner, Corlew's supervisor, knew about his supposedly unconstitutional directions. And of course, a policymaker's knowledge of Corlew's custom is essential to his acquiescence in it. The record sheds no light on the chain of command at CCA, how policies are created, and who at CCA is authorized to make policy of this kind.[3] *See Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993) (holding that determination of official's authority to make policy is dependent on relevant state and local law). Absent this, Braswell's claim is simply one of respondeat superior liability.

---

[2] Warden Gardner's testimony did establish that he met regularly with CCA Vice President Steve Conry and Managing Director Kevin Myers to discuss uses of force. R.23-8 (Gardner Dep.) at 22. This is unremarkable and should probably be regular operating procedure in any prison system.

[3] Perry did testify as to the chain of command within the prison, but that does nothing to establish who—if anyone in the corporately run prison—had policymaking authority. R.23-7 (Perry Dep.) at 17.

The majority errs by glossing over the requirement that any custom be traceable to a policymaker. The words "knowledge" and "acquiescence" appear nowhere in the majority's opinion. The majority does not claim that those elements are not required; it points to no cases in which we have ever held a municipal or corporate defendant liable for an unconstitutional custom under § 1983 without knowledge and acquiescence by a decisionmaking official. The majority simply ignores this requirement. This record, even viewed in the light most favorable to Braswell—as is required—contains no evidence to connect the alleged custom to any CCA policymaker.

The majority opinion appears to use "policy" and "custom" interchangeably, but those concepts are distinct. *See Ford v. Cnty. of Grand Traverse*, 535 F.3d 483, 496 (6th Cir. 2008). Here, the majority can only be referring to custom, because as Perry testified repeatedly, CCA employees were violating CCA policy when they failed to remove Horton from his cell for several months. *See* R.23-7 (Perry Dep.) at 4, 5, 22, 55.

Furthermore, CCA's official written policy on the use of force cannot possibly be unconstitutional. That policy states: "Every effort will be made to prevent and defuse situations that might require the use of force. If at all possible, non-forcible means, verbal intervention, negotiation, show of force, etc., will be attempted before using force as a last resort." *See id.* at 48. Elsewhere, the policy states: "The amount and type of force used will be the minimum amount necessary to control the situation [or] individual, and then only as a last resort consistent with the safety of the public, staff and inmates." *Id.* This is exactly the policy one would ordinarily expect a prison to have, and the lack of such a policy would undoubtedly open the door to even more prisoner

complaints. Also unremarkable are CCA's requirement that all uses of force be reported to its corporate office, and its practice of keeping records of these reports and reviewing the uses of force with the Warden of each facility.[4] R.23-8 (Gardner Dep.) at 19, 22. Prisoners routinely raise Eighth Amendment claims about the use of excessive force, and these records are indispensable to the operation of a prison facility. But the keeping of these records is hardly an indication that CCA had a policy of using insufficient force in managing the prisoners in its charge.

In short, CCA has adopted a specific policy designed to reduce the chances that excessive force will be used in its prisons. The majority would now use that policy against CCA by holding that Assistant Warden Corlew's <u>failure</u> to use force was the result of that policy, and that failure caused Horton's injury. While it is entirely possible that such an insufficient force claim could have been brought on Horton's behalf, it would have to have been brought against the proper defendants, that is, against the individuals who inflicted the injury by failing to use the requisite force, or against

---

[4]The majority emphasizes the allegation that CCA uses the number of use-of-force incidents to determine bonuses and pay raises for CCA employees. Perry's testimony is vague and equivocal on this matter:

> There is a—I'm not in the corporate structure and I don't understand how they do it, but there is what's called zero tolerances at the facility, escape being one, rape . . . , riots, . . . escapes, hostage situations, and unnatural deaths, those things right there count against you majorly. They can be the difference between getting an $80 bonus check and a $500 bonus check. If you have any of those certain five things in a calendar year or a physical year, I don't know how they do it, you are toast as far as getting any kind of a substantial bonus. Other things come into play, you know, the budget, are you able to, you know, stay below budget, are you able to stay below use of force, are you able to keep certain inmates in school, you know, have them reporting to classes. And they track all of that and they reward you when you, you know, monetarily, when you do a good job, when you run the facility the way it need to be run.

R.23-7 (Perry Dep.) at 7. When asked later if the use of force to extract Horton from his cell would have affected bonuses, Perry simply responded, "It affected everything." *Id.* at 22. Gardner stated only that uses of force "could be" a factor in determining his bonus. R.23-8 (Gardner Dep.) at 22–23.

the policymakers who were responsible for the policy that resulted in that failure. But Braswell has brought this action only against CCA, and has presented evidence only that Corlew's failure to require a necessary use of force against Horton was in violation of CCA's policy that inmates be forced to regularly shower and clean their cells.

No doubt prison policymaking officials are unavoidably positioned between Scylla and Charybdis, that is, between permitting the use of too much force on the prisoners in their charge and not requiring the use of enough force. But we ought not further narrow that strait by holding, as the majority opinion does, that proof of an official policy of minimizing the use of force is enough to demonstrate an official policy of deliberate failure to use appropriate force. To survive a motion for summary judgment, Braswell was required to show evidence that Defendant CCA had a policy or custom that led to Horton's injuries. She has not provided that evidence. Because this issue is dispositive, I would not address the exhaustion and physical injury issues.

This case is a difficult one, not because of the legal issues involved, but because of the stakes for the Plaintiff. For whatever reason, Braswell decided to sue CCA instead of the individual persons responsible for the alleged unconstitutional treatment of Horton, and this required her to demonstrate an unconstitutional policy or custom on the part of CCA. Perry's testimony that Corlew instituted a new way of doing things gave Braswell a glimmer of hope, but she has ultimately failed to carry the day, even on summary judgment, because she cannot attribute this custom to any policymaker in CCA. This issue has been ignored or treated cursorily throughout the entire litigation. The district court's opinion merely stated, "Plaintiff articulates evidence that could

suggest a CCA policy regarding Plaintiff's Eighth Amendment claims."  R.48 (Dist. Ct. Order) at 22.  Braswell's opening brief on appeal made no mention of any alleged policy; her reply brief stated that any discussion of "official policy or custom at this time is premature and irrelevant to Plaintiff's appeal,"  Reply Br. at 14; and at oral argument, Braswell's counsel addressed the issue only in the final minutes.  The majority opinion continues this pattern by failing even to discuss any connection between the alleged custom and CCA.  Our sympathy for Mr. Horton's situation cannot permit us to ignore the law.  I would affirm the district court's order granting summary judgment to the defendant.