**Seth Nibert; Randall Hoar,**
**Defendants–Appellants**
**(14–4149).**

**Nos. 14–4149, 14–4151.**

United States Court of Appeals, Sixth Circuit.

Feb. 2, 2016.

John RUIZ–BUENO III; Michael Anthony Gay, Plaintiffs–Appellees (14–4149), Plaintiffs–Appellants (14–4151),

v.

Zack SCOTT, Franklin County Sheriff, in his individual and official capacities, et al., Defendants–Appellees (14–4151),

BEFORE: BOGGS and McKEAGUE, Circuit Judges; and BERTELSMAN, District Judge.*

BOGGS, Circuit Judge.

This case involves the death of Edward Peterson, a pretrial detainee at the Franklin County Corrections Center II in Ohio. Peterson was arrested for misdemeanor aggravated menacing and detained at the Franklin County Corrections Center II while awaiting trial. After spending nearly a month in jail, Peterson died from a preexisting heart condition. The administrator of Peterson's estate and Peterson's son sued fifty-three jail officials for Eighth Amendment violations, as well as for negligent provision of medical care, wrongful death, and loss of consortium, under Ohio law. The district court granted summary judgment on all claims to all defendants, except Deputies Nibert and Hoar. Those deputies appeal the court's denial of summary judgment, while the plaintiffs appeal the court's grant of summary judgment to the other defendants. After reviewing the record and applicable law, we reverse the court's denial of summary judgment to Deputies Nibert and Hoar, and affirm the court's grant of summary judgment to the other defendants.

I

On August 5, 2011, Edward Peterson was arrested on a misdemeanor charge of aggravated menacing. Upon arriving at the Franklin County Corrections Center

---

* The Honorable William O. Bertelsman, United States District Judge for the Eastern District of Kentucky, sitting by designation.

II, Peterson underwent medical screening, but did not sign a form authorizing the release of his medical information to the jail's medical staff. While Peterson informed the medical staff that he had mental-health problems, Peterson did not inform prison ·officials that he had been diagnosed with congestive heart failure in 2006.

Peterson had previously been diagnosed with bipolar disorder and schizoaffective disorder. When Douglas Hahn, a social worker who serves as the jail's mental-health liaison, observed Peterson, he appeared to be bipolar and psychotic. On Hahn's recommendation, Peterson was transferred to an isolation cell, and a prison psychiatrist subsequently prescribed Risperdal for Peterson's psychiatric disorders. Pursuant to a judge's order, a psychologist evaluated whether Peterson was competent to stand trial. The psychologist concluded that Peterson was "acutely psychotic" and "incapable of working collaboratively with an attorney or otherwise assist[ing] in his defense."

Peterson remained in the isolation cell for one month, until he died on September 4, 2011, from congestive heart failure. According to the plaintiffs' expert, Dr. Lester Suna, Peterson's heart condition had caused him to gain "30 plus pounds of 'edema' fluid weight" while he was in jail. His legs and feet became swollen and blistered, and the fluids accumulated in his lungs until he eventually drowned in his own fluids. In Dr. Suna's opinion, these symptoms should have been obvious to medical professionals and laypersons alike.

Two neighboring inmates, Charles Watson and Etonate Butler, recorded their observations on the morning of September 4 in handwritten statements. Watson said that at 3:30 AM, Peterson was "breathing really hard over in his cell" "as if he could not get enough air into his lungs," and he "started to moan and groan like he was in great pain." Watson heard Peterson moaning and groaning "for about an hour" and "did not hear anything else from him after that." Butler provided a similar account of the events, stating that Peterson "was makin' moaning noises all night since a lil before 3rd shift an[d] everybody kept askin' him is he okay and he kept sayin' NO!" According to Butler, Peterson had been asking for medical attention from members of the jail staff "everyday." In a subsequent affidavit, dated July 14, 2014, Butler stated that Peterson "frequently asked deputies and nurses for medical treatment." Butler last heard from Peterson at around 4:30 AM.

Deputy Seth Nibert, a floor deputy responsible for conducting rounds that morning, testified that he served Peterson breakfast at around 5:10 AM. Deputy Nibert had a brief verbal exchange with Peterson about whether Peterson wanted breakfast, and delivered the food to Peterson through a "food trap," without entering the cell. Deputy Nibert recalled that he "detected no unusual odor" and "saw no feces or food waste" in Peterson's cell. According to Deputy Nibert, Peterson "made no complaints of any kind and, in no way, seemed to require medical attention when I provided him breakfast on the morning of September 4, 2011.".

Deputy Hoar saw Peterson when he performed a head count between 7:35 AM and 7:45 AM. While Deputy Hoar did not complete the head count because he was distracted by another officer who spoke to him, he did recall seeing Peterson during the head count. Peterson appeared to be sitting on a bunk, leaning against the wall, sleeping, according to Deputy Hoar.

Two days before Peterson's death, Douglas Hahn visited Peterson and noticed that he looked physically ill. Hahn "talked to the floor nurse and every nurse

that was sitting in Booking or in the—at the nurses' desk [and] asked them to check on [Peterson]." Hahn did not follow up to determine whether anything was done in response to his request.

Then–Sergeant D'Errico of the Franklin County Sheriff's Office conducted an internal-affairs investigation and prepared a lengthy report documenting his findings. The report contained photographs taken on September 4 showing that Peterson's cell was, to quote the report, "in a state of disarray," with "excessive trash, food and feces scattered throughout." The report noted that a number of deputies claimed to have cleaned Peterson's cell, but those cleanings were not logged. The report recommended disciplining more than forty deputies for, among other things, failing to replace Peterson's mattress, ignoring the conditions of Peterson's cell, failing to observe Peterson properly, and failing to log certain events.

The administrator of Peterson's estate and Peterson's son sued fifty-three jail officials for Eighth Amendment violations under 42 U.S.C. § 1983, as well as negligent provision of medical care, wrongful death, and loss of consortium under Ohio law. The district court granted summary judgment on all claims to all defendants except Deputies Nibert and Hoar. For those two deputies, the court granted summary judgment with respect to the plaintiffs' claims for negligent provision of medical care, because Ohio does not recognize such a claim against nonmedical personnel. But on the § 1983 claims and the state-law claims for wrongful death and loss of consortium, the district court denied summary judgment.

## II

Deputies Nibert and Hoar appeal the district court's denial of qualified immunity and state statutory immunity. We have jurisdiction to consider their appeal. *See* 28 U.S.C. § 1291; Ohio Rev.Code § 2744.02(C) ("An order that denies . . . the benefit of an alleged immunity from liability as provided in this chapter or any other provision of the law is a final order."); *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) ("[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291.").

After the deputies filed their appeal, the district court certified the remainder of its summary-judgment order for appeal, determining that there was no just reason for delay. *See* Fed.R.Civ.P. 54(b). The plaintiffs then appealed the district court's grant of summary judgment to the other defendants on their § 1983 claims. Those defendants moved to dismiss the appeal. A motions panel rejected the argument that this court lacked jurisdiction, and referred to the merits panel the question of whether the district court abused its discretion in finding no just reason for delay. We agree with the district court that there is no just reason for delay, and decide these appeals together.

We note that in deciding these appeals, our jurisdiction is limited to considering "abstract issues of law." *Johnson v. Jones*, 515 U.S. 304, 317, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). "[F]or appellate jurisdiction to lie over an interlocutory appeal, a defendant seeking qualified immunity must be willing to concede to the facts as alleged by the plaintiff and discuss only the legal issues raised by the case." *Sheets v. Mullins*, 287 F.3d 581, 585 (6th Cir.2002). The district court's summary-judgment order is subject to de novo review, *see Thomas v. Cohen*, 304 F.3d 563, 568 (6th Cir.2002), and we draw all reasonable factual inferences in favor of the non-

moving party, *see Parsons v. City of Pontiac*, 533 F.3d 492, 499 (6th Cir.2008).

## III

The central issue in these appeals is whether the defendants are entitled to qualified immunity from the plaintiffs' § 1983 claims. Whether a defendant receives qualified immunity turns on two questions: did the defendant violate a constitutionally protected right, and if so, was the right clearly established at the time the act was committed? *See Pearson v. Callahan*, 555 U.S. 223, 232, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). These questions may be addressed in any order that will facilitate a fair and efficient disposition of the case. *Id.* at 242, 129 S.Ct. 808.

The plaintiffs have alleged violations of Peterson's constitutional rights based on several theories. First, they argue that the defendants failed to provide Peterson with adequate medical treatment for his heart condition. Second, they argue that the conditions of Peterson's confinement fell below minimal standards of decency. Third, they invoke a distinction between ministerial and discretionary actions, and characterize the defendants' actions as violations of ministerial duties. Finally, they argue that Franklin County should be held liable either because the Franklin County Sheriff's Office failed to train its officers properly, or because the county had a non-delegable duty to provide Peterson with adequate medical treatment. We address each of these theories in turn.

## A

■ The plaintiffs' first theory is that the defendants failed to provide Peterson with medical treatment for his heart condition, leading to his eventual death. We begin by addressing whether the plaintiffs have alleged a violation of clearly established law. The plaintiffs argue that the defendants' failure to provide medical care violated the Eighth Amendment's ban on cruel and unusual punishment. At the outset, we note that the Eighth Amendment does not directly protect pretrial detainees such as Peterson because it bans cruel and unusual *punishment,* and punishment occurs only after a person has been tried, convicted, and sentenced. *Bell v. Wolfish,* 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Roberts v. City of Troy,* 773 F.2d 720, 723 (6th Cir. 1985).

Pretrial detainees are instead protected by the Fourteenth Amendment's Due Process Clause, although these rights encompass the Eighth Amendment rights of prisoners. *Roberts,* 773 F.2d at 723. "This [c]ourt has made clear" that, under the Fourteenth Amendment, pretrial detainees are "entitled to the same Eighth Amendment rights as other inmates." *Thompson v. County of Medina,* 29 F.3d 238, 242 (6th Cir.1994). Thus, Supreme Court precedents governing prisoners' Eighth Amendment rights also govern the Fourteenth Amendment rights of pretrial detainees.

The district court assumed in its summary-judgment opinion that the plaintiffs intended to allege Fourteenth Amendment violations, and the parties litigated the case under that assumption. We therefore treat the complaint as having been constructively amended to allege Fourteenth Amendment violations. *See Wahlstrom v. Kawasaki Heavy Indus., Ltd.,* 4 F.3d 1084, 1087 (2d Cir.1993) (noting that "appellate courts, using Fed.R.Civ.P. 15(b) by way of analogy, permit constructive amendment of pleadings 'only when the effect will be to acknowledge that certain issues upon which the lower court's decision has been based or issues consistent with the trial court's judgment have been litigated' " (quoting 6A Charles Alan Wright et al.,

Federal Practice and Procedure § 1494 (2d ed.1990))).

The Fourteenth Amendment, incorporating Eighth Amendment precedent, guarantees a right to "humane conditions of confinement," including "adequate food, clothing, shelter, and medical care." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The test for alleged violations of this right has both an objective and a subjective component. *Id.* at 834, 114 S.Ct. 1970.

The objective component is satisfied by evidence showing that the alleged deprivation is "sufficiently serious" and that the official's act or omission resulted in the denial of the "minimal civilized measure of life's necessities." *Ibid.* When the alleged deprivation is based on an omission or failure to prevent harm, as is the case here, there must be evidence that the detainee was "incarcerated under conditions posing a substantial risk of serious harm." *Ibid.*

The subjective component is satisfied by evidence showing that the defendant acted with "deliberate indifference" to the substantial risk of serious harm. *Id.* at 835, 114 S.Ct. 1970. Deliberate indifference is "the equivalent of recklessly disregarding that risk." *Id.* at 836, 114 S.Ct. 1970. A jail official demonstrates deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837, 114 S.Ct. 1970.

Critical to the subjective inquiry is the requirement of specific evidence that *each individual defendant* acted with deliberate indifference. *See Garretson v. City of Madison Heights,* 407 F.3d 789, 797 (6th Cir.2005). In prior cases, we have vacated district-court decisions because they failed

to conduct such an individualized inquiry. *See Krutko v. Franklin County,* 559 Fed. Appx. 509, 511 (6th Cir.2014); *Bishop v. Hackel,* 636 F.3d 757, 767 (6th Cir.2011). While *Phillips v. Roane County* suggested that Sixth Circuit precedent does not necessarily forbid plaintiffs from using "general allegations to prove that each individual defendant has the requisite knowledge for deliberate indifference," 534 F.3d 531, 542 (6th Cir.2008), that passage must be read in context. *Phillips* also held that the district court's reasoning was flawed because it failed to "consider whether each individual defendant had a sufficiently culpable state of mind." *Ibid. Phillips* therefore did not eliminate the requirement of specific evidence demonstrating that each individual defendant acted with deliberate indifference. To the contrary, it affirmed this bedrock component of Eighth and Fourteenth Amendment jurisprudence, which we emphatically reaffirm here. *Phillips* simply held that, on the facts of that case, there was enough evidence for a rational jury to find that each defendant acted with deliberate indifference.

Here, the specific constitutional violation alleged by the plaintiffs is that the defendants failed to provide adequate medical care for Peterson's heart condition. Supreme Court precedent clearly establishes that detainees and prisoners have a constitutional right to life-saving medical care. *See, e.g., Farmer,* 511 U.S. at 832, 114 S.Ct. 1970; *Estelle v. Gamble,* 429 U.S. 97, 103–04, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). As such, we move on to determine whether the facts, taken in the light most favorable to the plaintiffs, could lead a reasonable jury to find that the defendants violated that right.

Peterson's heart condition obviously constitutes an objective, substantial risk of serious harm, given that it ultimately caused his demise. But for the vast ma-

jority of the defendants—none of whom are medical professionals—there is no evidence that they were subjectively aware of this risk. Nothing in the record shows that they thought Peterson needed additional medical attention, and they reasonably relied on the judgment of numerous doctors and nurses, *who saw Peterson at least three times a week,* but were not aware of his heart condition. Peterson's last documented visit by a medical professional was on September 2, 2011, two days before his death, when he met with a psychiatrist, Dr. Wooten, who increased the dosage of his mental-health medication.

While Dr. Suna opined that Peterson's heart condition resulted in the gradual swelling of his lower extremities, which would have been obvious to a lay person, there is no evidence in the record demonstrating that any of the defendants were actually aware of any such swelling. Etonate Butler, who lived in a cell next to Peterson, stated that Peterson asked for medical attention from members of the jail staff "everyday," and that Peterson "frequently asked deputies and nurses for medical treatment," but these statements are too vague to establish subjective awareness on the part of any individual defendant. Without such evidence, the individualized inquiry of the subjective component cannot be met, and the defendants cannot be held liable.

With respect to a few of the defendants, a more detailed discussion of the facts is warranted. Defendant Douglas Hahn, a social worker who serves as the jail's mental-health liaison, testified that he saw Peterson two days before Peterson died, and thought that Peterson looked physically ill. This establishes that Hahn was subjectively aware of a substantial risk of serious harm to Peterson. There is no proof, however, that Hahn acted with deliberate indifference to that risk. Once Hahn saw that Peterson looked ill, he "talked to the floor nurse and every nurse that was sitting in Booking or ... at the nurses' desk [and] asked them to check on [Peterson]." Although Hahn did not follow up to determine whether anything was done in response to his request, the fact that Hahn requested medical attention for Peterson is sufficient to demonstrate that he was not deliberately indifferent.

Two of the defendants, Deputies Nibert and Hoar, saw Peterson on the morning of September 4, 2011. Deputy Nibert provided breakfast to Peterson at 5:10 AM, and Deputy Hoar saw Peterson lying against the wall of his cell when he performed a head count of the inmates at around 7:35 or 7:45 AM. A few hours before these two deputies saw Peterson, two inmates observed Peterson moaning in great pain and struggling to breathe. Charles Watson stated that at 3:30 AM, Peterson was "breathing really hard over in his cell" "as if he could not get enough air into his lungs," and he "started to moan and groan like he was in great pain." Watson said that he heard Peterson moaning and groaning "for about an hour" and "did not hear anything else from him after that." Etonate Butler provided a similar account of the events, stating that Peterson "was makin' moaning noises all night since a lil before 3rd shift an[d] everybody kept askin' him is he okay and he kept sayin' NO!" Butler last heard from Peterson at around 4:30 AM.

In Dr. Suna's medical opinion, Peterson suffered from congestive heart failure, which caused edema—excess fluid accumulation—in his lungs, liver, and lower extremities, and ultimately caused his death. Dr. Suna opined that "[i]f Mr. Peterson's conditions had been noticed by prison officials and appropriately relayed to medical staff at the onset of his dramatic change

around 3:30 AM on 9/4/2011 or over the next 4 1/2 to 5 1/2 hours, he could have been successfully treated and he could have survived."

Based on the foregoing evidence, the district court held that a reasonable jury could find that Deputies Nibert and Hoar acted with deliberate indifference. The problem with this conclusion is that there is no evidence that the two deputies were subjectively aware that Peterson needed emergency medical attention. The observations of inmates Watson and Butler establish that Peterson was in great pain from around 3:30 to 4:30 AM, but there is no evidence that any of the defendants observed Peterson at that time. The two inmates also stated that Peterson went silent at around 4:30 AM. If we assume that Peterson died at 4:30 AM, then there was nothing Deputies Nibert and Hoar could have done to save him when they saw him later that day. If we assume that Peterson was alive when the two deputies saw him, we would then have to ask whether they became aware of a substantial risk of serious harm to Peterson after interacting with him. Unfortunately for the plaintiffs, there is little evidence regarding the deputies' knowledge after they saw Peterson that morning.

The primary evidence of the mental states of these two deputies is their sworn declarations, which directly contradict the plaintiffs' claims. Deputy Nibert stated that Peterson did not appear to require medical attention when he served Peterson breakfast on September 4. Deputy Hoar stated that when he was performing his rounds, Peterson appeared to be sleeping in his cell. The plaintiffs argue that we should decline to credit these two officers' statements because we must draw all reasonable factual inferences in favor of the plaintiffs. We agree, but even so, impeaching the defendants' evidence does not relieve the plaintiffs of their affirmative obligation to produce evidence of deliberate indifference.

The only evidence suggesting that Peterson might have appeared sick to the two deputies is that, according to Dr. Suna and Butler, his feet were swollen and blistered. Assuming that Peterson's feet were swollen and blistered at the time the deputies saw him, and assuming that the deputies noticed his feet, there is still no evidence to suggest that the deputies drew a connection between Peterson's feet and his life-threatening congestive heart failure. Deliberate indifference requires evidence that the official being sued not only perceived facts from which to infer substantial risk, but "did in fact draw the inference, and ... then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir.2001). Without such evidence, Peterson's swollen and blistered feet alone cannot establish deliberate indifference. Although we must read the facts in the light most favorable to the plaintiffs, we will not allow a case to go to trial on a theory rooted in speculation rather than evidence. Because of the lack of evidence demonstrating that Deputies Nibert and Hoar—or any of the defendants—were subjectively aware of a substantial risk of serious harm to Peterson, it cannot be shown that they acted with deliberate indifference.

It may well be that the tragic death of Edward Peterson was avoidable. If jail officials had known about his heart condition, or noticed that something was wrong with him on the morning of September 4, 2011, they may have been able to save his life. But the Fourteenth Amendment does not permit claims against jail officials for negligence, that is, claims regarding what jail officials *should* have known or *should* have done. Instead, it requires *deliberate indifference* to a known substantial risk of

serious harm. In this case, there is insufficient evidence for a jury to find that any of the defendants acted with deliberate indifference.

## B

■ The plaintiffs' second theory is that the conditions of Peterson's confinement fell below minimal standards of decency. This theory fails because the plaintiffs cannot demonstrate a violation of clearly established law. In determining whether clearly established law has been violated, we examine the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Pearson*, 555 U.S. at 244, 129 S.Ct. 808 (quoting *Wilson v. Layne*, 526 U.S. 603, 614, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). This requirement "operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (internal quotation marks omitted).

Before discussing the areas of law that are not clearly established, it is helpful to review the areas of law that are. As we discussed earlier, pretrial detainees have a right to "humane conditions of confinement," including "adequate food, clothing, shelter, and medical care." *Farmer*, 511 U.S. at 832, 114 S.Ct. 1970. The *Farmer* inquiry's objective component requires proof that the alleged deprivation is "sufficiently serious" and that the official's act or omission resulted in the denial of the "minimal civilized measure of life's necessities." *Id.* at 834, 114 S.Ct. 1970. If the deprivation is based on an omission or failure to prevent harm, there must be evidence that the detainee was "incarcerated under conditions posing a substantial risk of serious harm." *Ibid.*

The plaintiffs argue that Peterson was denied humane conditions of confinement because he lacked a mattress and his cell was covered in feces, food, and other filth at certain points during his confinement. The plaintiffs cite the photographs taken of Peterson's cell on the day he died, the testimony of certain officers and inmates, the Internal Affairs Bureau report, and the absence of log entries documenting cell cleanings as evidence. The plaintiffs argue that the conditions of Peterson's cell—which were caused by Peterson himself—violate the Constitution, regardless of whether those conditions contributed to his heart problems or posed any other substantial risk of serious harm to Peterson's health.

The plaintiffs' argument does not square with the language of *Farmer*. "The Constitution 'does not mandate comfortable prisons.'" *Id.* at 832, 114 S.Ct. 1970 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). While the plaintiffs emphasize that *Farmer* requires "humane conditions" and the "minimal civilized measure of life's necessities," they ignore crucial passages from *Farmer* stating that there must be "a substantial risk of serious harm," a phrase that the Court has treated as interchangeable with "an excessive risk to inmate health or safety." *Id.* at 837, 114 S.Ct. 1970.

To support their argument, the plaintiffs rely primarily on a Seventh Circuit decision, *Rice v. Correctional Medical Services*, 675 F.3d 650 (7th Cir.2012). In that case, Rice was placed in administrative segregation for seven months. *Id.* at 659. The plaintiffs alleged that Rice's cell:

was often filthy and unsanitary, that uneaten food was left to rot there, that his skin was sometimes caked with his own feces, that he had an extremely foul body odor owing to the long periods of

time during which he went unbathed, and that he either developed or was on the verge of developing bedsores on multiple occasions. *Id.* at 663–64. On these facts, the Seventh Circuit held that there was a genuine issue of material fact as to whether the conditions of Rice's confinement violated the Eighth Amendment. *Id.* at 665.

The closest Sixth Circuit analogue to *Rice* cited by the plaintiffs is *Braswell v. Corrections Corporation of America,* 419 Fed.Appx. 622 (6th Cir.2011). In *Braswell* an inmate was allegedly left in an unsanitary cell "for nine consecutive months, without a shower or an opportunity to exercise." *Id.* at 627. The court held that, on those facts, there was a genuine issue of material fact as to whether the inmate suffered an Eighth Amendment violation. The court made no reference to the objective or subjective components of the *Farmer* test, and did not articulate what it believed to be the scope and limit of the Eighth Amendment with respect to claims alleging unsanitary conditions.

The facts of *Braswell* and *Rice* have some similarities to the facts of this case, but those cases do not clearly establish that the defendants violated Peterson's constitutional rights. In addition to *Rice* being an out-of-circuit decision and *Braswell* being an unpublished decision, those cases involved individuals who were allegedly left in unsanitary conditions for a much longer period of time than Peterson was. Rice was placed in segregation for seven months, and Braswell was placed in isolation for nine months. Here, Peterson was in isolation for approximately one month.

In that one-month period, Peterson's cell was cleaned by prison officials. Deputy Haeberlin and Deputy Wood recalled that they cleaned Peterson's cell on August 14, 2011. Deputy Ward stated that on August 27, 2011, eight days before Peterson died, he saw Sergeant Bachelder and Corporal McDowell clean Peterson's cell. Sergeant Bachelder and Corporal McDowell corroborated Ward's statement, recalling that they cleaned Peterson's cell at some time in August. Etonate Butler remembered one instance in which Peterson's cell was cleaned. While it is true that jail officials did not regularly document all cell cleanings, that does not permit us to infer, as the plaintiffs ask us to, that Peterson's cell was never cleaned. In addition, while there is no documentation of Peterson's specific cell being cleaned by jail officials, the log book for the 1–S–2 area of the jail, where Peterson lived, indicates that on numerous occasions, cleaning supplies were passed out to inmates and inmates were given an opportunity to throw away trash. Even drawing all reasonable factual inferences in favor of the plaintiffs, Peterson's alleged treatment did not violate clearly established law.

C

The plaintiffs argue that we should deny the defendants qualified immunity on the basis of a Sixth Circuit case dealing with Kentucky's doctrine of qualified immunity, as articulated by the Supreme Court of Kentucky. *See Hedgepath v. Pelphrey,* 520 Fed.Appx. 385 (6th Cir.2013). Under Kentucky law, "an officer or employee is afforded no immunity from tort liability for the negligent performance of a ministerial act." *Yanero v. Davis,* 65 S.W.3d 510, 522 (Ky.2001). Ministerial acts involve obedience to the orders of others, while discretionary acts involve the good-faith exercise of discretionary policy judgment within the scope of the employee's authority. *Ibid. Hedgepath,* in an attempt to restate this doctrine, characterized *Yanero* as establishing a distinction between "ministerial duties" and "discretionary duties." *Hed-*

*gepath,* 520 Fed.Appx. at 389. The plaintiff in *Hedgepath* sued jail officials for failing to provide medical treatment to a detainee who died of a drug overdose. *Id.* at 386. Because the plaintiff alleged a violation of a jail policy requiring intoxicated detainees to be observed every twenty minutes—a "ministerial duty"—the court denied the defendants qualified immunity under Kentucky law. *Id.* at 390–92.

This appeal does not involve the plaintiffs' state-law claims. Instead, the plaintiffs ask us to apply *Hedgepath* to their federal claims. According to the plaintiffs, the defendants violated their ministerial duties by failing to clean Peterson's cell and provide him with adequate medical treatment; therefore, the defendants are not entitled to qualified immunity.

At the outset, we note that *Hedgepath*'s attempted restatement of *Yanero* may be more confusing than clarifying—"discretionary duty" is oxymoronic and "ministerial duty" is redundant. Regardless, the biggest flaw with the plaintiffs' reliance on *Hedgepath* is that this case has nothing to do with Kentucky law. The plaintiffs are appealing from the district court's ruling on their federal § 1983 claims. They have not appealed the district court's ruling on their state-law claims, which would be governed by Ohio law in any event. *Hedgepath* is therefore inapplicable.

The Sixth Circuit has occasionally acknowledged a distinction between ministerial and discretionary actions, but the cases dealing with this distinction are few and far between, and involve affirmative *acts* taken by officials, rather than alleged *failures* by officials to perform job duties. *See, e.g., Hudson v. Hudson,* 475 F.3d 741, 744 (6th Cir.2007); *Morrison v. Lipscomb,* 877 F.2d 463, 468 (6th Cir.1989). We therefore find the plaintiffs' ministerial-duty argument to be lacking in merit.

**D**

■ The plaintiffs argue for municipal liability on the part of Franklin County, based on the Franklin County Sheriff's Office's failure to train officers to check on the well-being of detainees properly. Plaintiffs who seek to impose liability on local governments under § 1983 must prove that "action pursuant to official municipal policy" caused their injury. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "[A] municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Connick v. Thompson,* 563 U.S. 51, 61, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011) (internal quotation marks omitted). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 62, 131 S.Ct. 1350 (internal quotation marks omitted).

Here, the plaintiffs point to nine instances, dating back to 1997, in which deputies were disciplined for failing to conduct security checks. In addition, they point to a 2007 incident in which a lieutenant failed to have his staff open the cell door of an inmate who hanged himself. A disciplinary proceeding against an officer does not necessarily mean that the officer acted unconstitutionally, however, and the plaintiffs do not explain why they think these incidents violated the Constitution. Nor do they explain how each of these incidents was linked to an alleged failure to train. We do not think these ten incidents in the past eighteen years demonstrate a pattern of constitutional violations that satisfies the burden of proving deliberate indifference. As the Supreme Court has noted, "[a] municipality's culpability for a deprivation of rights is at its most tenuous

where a claim turns on a failure to train." *Id.* at 61, 131 S.Ct. 1350. We hold that the evidence is insufficient to show that Peterson suffered a constitutional violation as a result of official municipal policy.

The plaintiffs have also asserted that Franklin County can be held liable for failing to provide Peterson with adequate medical care, citing *Leach v. Shelby County Sheriff,* 891 F.2d 1241 (6th Cir.1989). *Leach* involved a municipal-liability claim of the sort discussed in *Monell* and *Connick,* and the plaintiffs have cited no evidence establishing a pattern of constitutional violations concerning medical care that is significant enough to constitute official municipal policy.

The plaintiffs also quote a passage from *West v. Atkins* stating that "[c]ontracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights." 487 U.S. 42, 56, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Based on this passage from *West,* the plaintiffs argue that Franklin County had a nondelegable duty to provide Peterson with adequate medical treatment, and can be held liable for Peterson's death. But *West* does not mean what the plaintiffs cite it for. *West* held that a physician who contracted with the state to provide medical services to inmates at a state prison hospital acted under color of state law, and could therefore be sued under § 1983. If the plaintiffs wanted to sue a doctor who worked at the jail as a contractor, *West* says that they may do so. But the plaintiffs have not sued any medical personnel in this case, and *West* does not provide them with an alternate theory for holding Franklin County liable.

IV

Deputies Nibert and Hoar have also appealed the district court's denial of statutory immunity with respect to the plaintiffs' state-law claims for wrongful death and loss of consortium. Employees of political subdivisions are immune from liability under Ohio law, but this immunity does not cover acts or omissions made "with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev.Code § 2744.03(A)(6)(b). For the same reasons that Deputies Nibert and Hoar cannot be found to have acted with deliberate indifference, we hold that there is insufficient evidence to find that they acted with malicious purpose, in bad faith, or in a wanton or reckless manner. *See Farmer,* 511 U.S. at 836, 114 S.Ct. 1970 ("It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk."); *id.* at 839–40, 114 S.Ct. 1970 ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard ... and we adopt it as the test for 'deliberate indifference' under the Eighth Amendment."); *Stefan v. Olson,* 497 Fed.Appx. 568, 580–81 (6th Cir.2012) (noting similarities between the Eighth Amendment "deliberate indifference" standard and Ohio's "wanton or reckless manner" standard). Deputies Nibert and Hoar are entitled to immunity against the plaintiffs' state-law claims.

V

For the foregoing reasons, we REVERSE the district court's denial of summary judgment to Deputies Nibert and Hoar on the plaintiffs' § 1983 claims and state-law claims for wrongful death and loss of consortium. We AFFIRM the

court's grant of summary judgment to the other defendants.