RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0151p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
───────────────

SARAH WILSON, as Administrator of the Estate of Jack Huelsman; CHERYL HUELSMAN,

*Plaintiffs-Appellants*,

*v.*

No. 20-4161

ERIC GREGORY and MEREDITH WALSH, individually and in their official capacities as employees of Clermont County, Ohio; CLERMONT COUNTY, OHIO/CLERMONT COUNTY, OHIO BOARD OF COMMISSIONERS; ROBERT LEAHY, in his official capacity as Sheriff of Clermont County, Ohio,

*Defendants-Appellees*.

───────────────

Appeal from the United States District Court for the Southern District of Ohio at Cincinnati.
No. 1:17-cv-00554—Timothy S. Black, District Judge.

Argued: April 22, 2021

Decided and Filed: July 1, 2021

Before: KETHLEDGE, STRANCH, and BUSH, Circuit Judges.
───────────────

## COUNSEL

**ARGUED:** M. Caroline Hyatt, GERHARDSTEIN & BRANCH CO. LPA, Cincinnati, Ohio, for Appellants. Jeannette E. Nichols, CLERMONT COUNTY PROSECUTOR, Batavia, Ohio, for Appellees. **ON BRIEF:** M. Caroline Hyatt, Alphonse A. Gerhardstein, GERHARDSTEIN & BRANCH CO. LPA, Cincinnati, Ohio, for Appellants. Jeannette E. Nichols, G. Ernie Ramos, Jr., CLERMONT COUNTY PROSECUTOR, Batavia, Ohio, Kimberly A. Rutowski, LAZARUS & LEWIS, LLC, Cincinnati, Ohio, for Appellees.

STRANCH, J., delivered the opinion of the court in which KETHLEDGE, J., joined, and BUSH, J., joined in part. STRANCH, J. (pp. 22–23), also delivered a separate concurring opinion in which KETHLEDGE, J., joined in Part A. BUSH, J. (pp. 24–27), delivered a separate opinion concurring in part and dissenting in part.

---

**OPINION**

---

JANE B. STRANCH, Circuit Judge.   The claims in this case result from a mental health crisis suffered by Jack Huelsman, who lived with what family members describe as symptoms of paranoia and bipolar disorder.   In the midst of the crisis, his wife, Cheryl Huelsman, a nurse, called their daughter and urged her to call 911.   Clermont County Deputies Eric Gregory and Meredith Walsh responded to the call.   They were aware of Mr. Huelsman's mental health and that there might be guns in the house.   When they arrived, Deputy Gregory called off the paramedics who had also responded.   Deputy Gregory spoke with both Mrs. Huelsman, who expressed her desperate fear that her husband would commit suicide, and Mr. Huelsman, whom Deputy Gregory considered to be lucid.   Mrs. Huelsman repeatedly exhorted Gregory not to leave Mr. Huelsman alone, but the Deputy left him inside the home, unattended, for about nine minutes.   Mr. Huelsman committed suicide.

Mrs. Huelsman and her daughter Sarah Wilson (the "Huelsmans") sued the Deputies and other County officials (the "Defendants").   They asserted claims for deprivation of civil rights under 42 U.S.C. § 1983; denial of public services under the Americans with Disabilities Act (ADA); and multiple torts under Ohio law.   The district court granted the Defendants' motion for summary judgment.   We **AFFIRM** that decision as to the Huelsmans' § 1983 and ADA claims and **VACATE** it as to their state law claims against Deputies Gregory and Walsh.

**I.  BACKGROUND**

**A.  Factual Background**

At age 64, Mr. Huelsman experienced what family members describe as symptoms of paranoia and bipolar disorder.   On September 19, 2015, he accused Mrs. Huelsman of playing recordings of political speeches outside his door; taking and crumpling Korean money; stealing his wallet and keys; and sabotaging his electronic devices.   Mrs. Huelsman had worked as a nurse in the area for many years, often encountering people experiencing mental health crises, and was familiar with the types of first responders that would generally be dispatched to respond

to calls of mental health crises. Distressed, she called their daughter, Ms. Wilson, to tell her about Mr. Huelsman's mental health crisis and ask for help calming Mr. Huelsman. Mr. Huelsman repeated his delusions to Ms. Wilson, told her that Mrs. Huelsman "wouldn't be able to stay in the house because she wouldn't get life insurance if he killed himself " and said that "[h]e was a prisoner in his own home" and "had no reason to live" (in Ms. Wilson's words) before hanging up. (R. 40, Wilson Dep., PageID 347, 380) Ms. Wilson and Mrs. Huelsman decided to call 911, but because Mrs. Huelsman felt she could not do so within Mr. Huelsman's earshot, Ms. Wilson made the call. Once on the phone with the 911 dispatcher, she explained:

> [MS. WILSON:] I'm not exactly positive what's wrong with my dad, but I think he's having a psychiatric emergency. He's -- it sounds like he's completely out of his mind. He's hearing voices. He's talking about possibly committing suicide. I think he needs to be transported to -- Good Sam [a nickname for a local hospital] is where we would like for him to go.
>
> . . .
>
> 911 OPERATOR: Okay. I've got a couple questions for you. If you don't know the answer, you can just say, I don't know. Is he violent?
>
> MS. WILSON: I don't know.
>
> 911 OPERATOR: Does he have a weapon?
>
> MS. WILSON: Yes.
>
> 911 OPERATOR: Okay. What type of weapon does he have?
>
> MS. WILSON: There are guns in the house. I'm pretty sure that my mom has, over the past couple months, locked them all up in a safe. I don't know that he has access to them right now, but I am not positive about that. And I don't -- I don't think he has a weapon on him currently. I don't think there's any danger to the life squad or anything like that.
>
> 911 OPERATOR: Okay. Where is he now?
>
> MS. WILSON: He is, I think, in his family room.
>
> 911 OPERATOR: Okay. Is this a suicide attempt?
>
> MS. WILSON: I don't think so.
>
> 911 OPERATOR: Okay. Is he thinking about committing suicide?
>
> MS. WILSON: I think that's a possibility.
>
> 911 OPERATOR: Okay. Is he completely alert?

MS. WILSON:  It sounds like he's completely alert.  I just got off the phone with him.  And he -- he heard voices outside of his bedroom door this morning.  He said there was a screaming match about politics.  And he thinks that my mom played a recording to try and make him appear crazy.

911 OPERATOR:  Okay.

MS. WILSON:  And then he -- he thinks that she stole his keys and his wallet and disabled his computer and his phone so that he can't go anywhere, so that he appears crazy and he might as well kill himself, because his life is destroyed.  And that -- he is mentally ill.  He has a mental disorder.

911 OPERATOR:  Okay.

MS. WILSON:  And I think he has been on kind of a downward decline, like possible dementia, maybe Alzheimer's.  But it hasn't been diagnosed yet.  So something was definitely going on this morning that is a lot worse.

911 OPERATOR:  Okay.  All right.  Well, I'm sending paramedics to help you out.

(R. 50-12, 911 Call Tr., PageID 1778–82)

Deputies Gregory and Walsh responded to the call.  The dispatcher told them, verbally and in writing via their car computer:

[likely 12:07 p.m.]  64 year old, Male, Conscious, Breathing. Psychiatric / Abnormal Behavior/ Suicide Attempt.  Caller Statement: HEARING VOICES 64 [year old male].

[12:09 p.m.]  MALE IS BI-POLAR

[12:10 p.m.]  The caller is not with the patient.  There is a single patient.  It's not known if he is violent.  He has access to a weapon.  A gun is accessible.  The patient is inside the same structure.  This is not a suicide attempt.  He is thinking about but not threatening to commit suicide.  He is completely alert (responding appropriately).

[12:12 p.m.]  CALLER IS NOT ON SCENE, MALE DID NOT SOUND VIOLENT TO HER ON THE PHONE, HE IS BI-POLAR AND SHE BELIEVES HE MAY HAVE BEEN HAVING A MENTAL DECLINE IN THE LAST COUPLE OF MONTHS.

(R. 41-6, CAD Rep., PageID 467–68)  The parties dispute whether Deputies Gregory and Walsh were aware of this information from the dispatcher before arriving at the Huelsmans' home.  Walsh subsequently confirmed that her later report contained this information and that there was no other way she could have learned of it.  Nevertheless, both Deputies were aware that Mr.

Huelsman was acting abnormally, and they had been trained in mental health crisis intervention, which included learning the information that a majority of people who die by suicide lived with preexisting mental health conditions.

While they were on their way, Mrs. Huelsman spoke with Mr. Huelsman to try to calm him and deescalate the situation. The Deputies arrived and Mrs. Huelsman invited Deputy Gregory inside. Deputy Gregory asked about what was happening and Mrs. Huelsman told him that Mr. Huelsman "was having a mental illness crisis," explaining the situation and Mr. Huelsman's delusional accusations. (R. 39, Huelsman Dep., PageID 234) Deputy Gregory responded, as Mrs. Huelsman recalled it, "I'm not going to put him in the back of a squad car and haul him away based on what you're telling me." (*Id.* at PageID 235) She replied to the effect that "you have to understand that this is not his normal behavior. He is completely and totally . . . out of his mind . . . and we definitely need this intervention." (*Id.* at PageID 236) Mr. Huelsman had been silent up to this point, but then said that the voices he believed he was hearing were actually coming from the radio and that he thought Mrs. Huelsman had manipulated his devices. In Deputy Gregory's recollection, Mr. Huelsman was unable to explain exactly how any of them were not working properly.

In the meantime, emergency medical services (EMS) personnel had arrived and were waiting for the Deputies' go-ahead. Though EMS personnel's ability to provide mental health services was limited to asking basic questions to test a person's mental acuity, their training and policy permitted them to assess a person's mental condition and make a recommendation to a deputy that the person should or should not be detained. Within four minutes of his arrival at the Huelsmans' home, Deputy Gregory called off EMS.

After that, as Mrs. Huelsman explained:

> [Deputy Gregory] kind of looked down a little bit and he says what I think we have here is a domestic dispute, and he without asking any other questions or anything, he said I think we have a domestic dispute. I said I can assure you that this is not a domestic dispute. This is a mental illness crisis.
>
> And he said . . . I want you to come with me, talking to me, and he took me back around and out the back door and led me over close to the tree.

(*Id.*)  Mrs. Huelsman thought this was "good" because to her, Deputy Gregory's actions indicated that "he was trying to diffuse [sic] the situation by not talking about [Mr. Huelsman] right in front of him, and I thought he was going to put me over there and come back and talk to me."  (*Id.* at PageID 237–38)  Deputy Gregory said that he would "call crisis intervention," which Mrs. Huelsman thought was "suitable."  (*Id.* at PageID 240)  As Mrs. Huelsman was taken outside, she "kept saying don't leave [Mr. Huelsman] in there, stay with him" "multiple times" to Deputy Gregory and "begged and begged that [Mr. Huelsman] not be left alone."  (*Id.* at PageID 238)  At that moment, Mrs. Huelsman did not tell Deputy Gregory specifically why she believed Mr. Huelsman should not be left alone—i.e., her perception of the risk of his suicide—because she "was under the impression that . . . when [Ms. Wilson] called 911, [she] had told them that there was a . . . possibility of suicide."  (*Id.* at PageID 247)

Deputy Walsh then arrived and joined Deputy Gregory, who was speaking with Mrs. Huelsman.  Mrs. Huelsman told them that Mr. Huelsman was suicidal.  She also explained, in Deputy Walsh's recollection, that "she was not able to leave [Mr. Huelsman] because if she left him then he would kill himself."  (R. 48, Walsh Dep., PageID 1209; *see also* R. 41-3, Offense Reps., at PageID 455)  Mr. Huelsman, who was still inside the house, yelled outside that "all I said was that if I ever killed myself you couldn't make it because you can't afford the house." (R. 41-3 at PageID 455; R. 50, Gregory Dep., PageID 1512)  Mrs. Huelsman confirmed that Mr. Huelsman had said that, and stated that she believed this was a threat of suicide, but Deputy Gregory did not interpret Mr. Huelsman's statement that way.  Deputy Gregory later described his response to Mrs. Huelsman as:

> [W]ell, depending on how you take it.  Maybe you're his wife, and maybe you would take it that way, but – I said, for me . . . it's more of a statement, a generalized statement, that – you know, whatever their relationship is.
>
> . . .
>
> He didn't say, I'm going to kill myself.  He said, if I ever did it, you couldn't make it because you couldn't afford the house.

(R. 50-11, Gregory Interview, PageID 1752)  Similarly, Deputy Walsh later stated that "Deputy Gregory had spoken with [Mr. Huelsman] and [he] was not making any threats to harm himself.

He was denying any thoughts of harming himself.  And we had no information to contradict that from his wife." (R. 48 at PageID 1229–30)

The parties offer markedly different accounts of Mrs. and Mr. Huelsman's respective demeanors throughout this part of the Deputies' encounter with them.  In the Huelsmans' account, Mrs. Huelsman "was emotional as she described her husband's deteriorating mental condition but calmly and clearly articulated the details of Mr. Huelsman's mental health crisis to Deputy Gregory."  The Defendants characterize Mrs. Huelsman as "upset and crying," and assert that as the encounter continued, she "became increasingly upset and was having a difficult time communicating."  As they put it, Mrs. Huelsman was "hysterical to the point that the Deputies couldn't understand her."  By contrast, in the Huelsmans' telling, Mr. Huelsman was "agitated" and "irrational."  But according to the Defendants, he was "calm, composed, coherent[,] and rational."  These opposing sets of descriptions often rely on different people's accounts, and there is no audio or video recording of the events in the record to add clarity.

Additionally, the dispatcher had previously told the Deputies that there were guns in the Huelsmans' house.  Deputy Gregory was aware that there were guns in the house but believed they were "all secured"—Mrs. Huelsman had stated that she had hid two guns from Mr. Huelsman out of fear, but Deputy Gregory did not ask if there were more than two guns in the house.  Likewise, Deputy Walsh was aware there were guns in the house—Mrs. Huelsman told her as well that "all of the guns had been hidden or locked away," but also that Mr. Huelsman "was sleeping with a gun under his pillow." (*Id.* at PageID 1209, 1224)

Next, Deputy Gregory reentered the house to talk to Mr. Huelsman while Deputy Walsh waited with Mrs. Huelsman outside.  In that conversation, Mr. Huelsman told Deputy Gregory that he was "upset about [Mrs. Huelsman] taking and locking away all his guns, taking his driver's license, taking his car keys, basically taking away his freedom"; he had received a terminal cancer diagnosis; and he was under a psychiatrist's care. (R. 50 at PageID 1398–99, 1409; *see also* R. 50-11 at PageID 1753–54)

Deputy Gregory then left the house to speak with Deputy Walsh, and they told each other what they had learned from Mr. and Mrs. Huelsman, respectively.  They received a new dispatch

call about an unrelated incident involving someone not breathing, to which Deputy Walsh left to respond. Deputy Gregory went to his car to call his supervisor, leaving Mr. Huelsman alone in the house. Deputy Gregory's supervisor approved Deputy Gregory's decision to call the county's "Mobile Crisis" unit, a team of social workers specially trained to respond to people experiencing mental health crises. The Mobile Crisis operator recorded that Deputy Gregory said the initial dispatch resulted from Ms. Wilson's call that Mr. Huelsman was suicidal, Mrs. Huelsman said Mr. Huelsman was suicidal, Mr. Huelsman had a "history of [b]ipolar disorder," and Mr. Huelsman told Deputy Gregory he was "under the care of a psychiatrist who stated he [was] 'doing well.'" (R. 50-8, Mobile Crisis Form, PageID 1726) But in a later report, Deputy Gregory stated that Mr. Huelsman "gave no indication of having any mental health issues" and that his supervisor recommended contacting Mobile Crisis to assess Mrs. Huelsman's "demeanor." (R. 41-3 at PageID 455) In any case, the Mobile Crisis operator recorded that Deputy Gregory asked for the team to "assess Mr. Huelsman, and possibly Mrs. Huelsman." (R. 50-8 at PageID 1727; *see also* R. 41-3 at PageID 455)

After calling Mobile Crisis, Deputy Gregory returned to the house, where he told Mr. Huelsman that the unit was on its way. They spoke about Mr. Huelsman's cancer and Mr. Huelsman told him that Mrs. Huelsman acted as his nurse. In a later interview, Deputy Gregory denied observing "any indication that [Mr. Huelsman] was going to harm himself" or seeing "any weapon . . . anywhere." (R. 50-11 at PageID 1760–61) Deputy Gregory went back outside, where he observed Mrs. Huelsman "crying uncontrollably," and got back into his car to take a follow-up call from Mobile Crisis. (R. 41-3 at PageID 455) From the car, he saw Mr. Huelsman "walk[] out on the porch," where "he stood . . . looking around" for a few minutes before returning inside. (*Id.*) Deputy Gregory remained in the car for a total of about nine minutes.

He then heard a loud sound from inside the house and "thought maybe [Mrs. Huelsman] threw something." (*Id.*) Deputy Gregory reentered the house to tell Mr. Huelsman that Mobile Crisis would be arriving shortly, but found him dead with a gun in his hand.

Afterward, Mobile Crisis, EMS, and additional deputies arrived. When one of the deputies told Mrs. Huelsman what had happened, she said, "I told you he would do this. Why did you leave him inside alone?" (*Id.* at PageID 457) In Mrs. Huelsman's recollection, she said,

"[T]his can't be.  This is why we called you," and "someone piped up and said I can assure you, Mrs. Huelsman, that we followed all procedures."  (R. 39 at PageID 267)  Later, when Deputy Gregory submitted his incident report, the reviewing detective returned it to him with an instruction:  "Dep. Gregory proof read [sic] your narrative.  You have to explain why you left the residence to return to your patrol unit, leaving both subjects unattended after she made you aware guns were in the [residence]."  (R. 41-4, Offense Rep. Approval Recs., PageID 464–65)

### B.  Procedural Background

Ms. Wilson and Mrs. Huelsman filed this lawsuit against Deputy Gregory in his individual and official capacities; Deputy Walsh in her individual and official capacities; Clermont County, Ohio; the County's Board of Commissioners; and Clermont County Sheriff Robert S. Leahy in his official capacity.  They asserted claims for deprivation of civil rights under 42 U.S.C. § 1983; denial of the benefits of public services under the ADA, 42 U.S.C. § 12132; and wrongful death, intentional infliction of serious emotional distress, and negligent infliction of emotional distress under Ohio law.  After discovery, the Defendants filed a motion for summary judgment claiming that the Deputies were entitled to qualified immunity; Clermont County, its Board, and Sheriff Leahy could not be held liable under § 1983; the evidence supporting the Huelsmans' ADA claims was insufficient; and both Deputies were entitled to statutory immunity for each of the state law tort claims.

The district court granted that motion.  *Wilson v. Gregory*, 491 F. Supp. 3d 299 (S.D. Ohio 2020).  It concluded that Deputies Gregory and Walsh were entitled to qualified immunity primarily because they did not violate any of Mr. Huelsman's constitutional rights, and even if they had, those rights were not sufficiently clearly established to impose liability.  *Id.* at 309–16.  Because the Huelsmans conceded that if Deputies Gregory and Walsh were not liable under § 1983, then Clermont County, its Board, and Sheriff Leahy would in turn not be liable, the district court ruled that those parties were also not liable for violating Mr. Huelsman's constitutional rights.  *Id.* at 316.  The district court rejected the Huelsmans' ADA claims, finding that they had not shown Deputy Gregory failed to offer a reasonable accommodation and noting that the initial claim of intentional discrimination against Mr. Huelsman would fail as well.  *Id.* at

316–18, 316 n.13.  And it decided that Deputies Gregory and Walsh were immune under Ohio law from the additional tort claims.  *Id.* at 319.

The Huelsmans timely appealed.

## II.  ANALYSIS

### A.  Standard of Review

"We review the district court's grant of summary judgment de novo."  *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 481 (6th Cir. 2020) (quoting *Romans v. Mich. Dep't of Hum. Servs.*, 668 F.3d 826, 835 (6th Cir. 2012)).  A party is entitled to summary judgment if it shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Specifically, it is the moving party's burden to "show[] the absence of a genuine dispute of material fact as to at least one essential element" of each claim for which it seeks summary judgment, with a "genuine dispute" existing when the nonmoving party presents "sufficient evidence from which a jury could reasonably find" in its favor.  *Troutman*, 979 F.3d at 481 (quoting *Romans*, 668 F.3d at 835).  On appellate review of "a grant of summary judgment in favor of the defendant, we draw all reasonable inferences in favor of the plaintiff."  *Id.*  We ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558–59 (6th Cir. 2005)).  Meanwhile, our review of the district court's analysis of state law is de novo.  *Id.* at 482.

### B.  The § 1983 Claims against Deputies Gregory and Walsh

"To bring a claim under § 1983, a plaintiff must 'identify a right secured by the United States Constitution and the deprivation of that right by a person acting under color of state law.'"  *Id.* (quoting *Watkins v. City of Battle Creek*, 273 F.3d 682, 685 (6th Cir. 2001)).  The Huelsmans assert that the Defendants deprived Mr. Huelsman of his "right to be free from unreasonable search and seizure" and "right to receive due process under the law" under the Fourth and Fourteenth Amendments, respectively.  (R. 1, Compl., at PageID 11)  Based on their briefs in

this court, though, the Huelsmans appear to have abandoned their claims against the County officials, and so we address only their claims against the Deputies. *See generally Bard v. Brown County*, 970 F.3d 738, 751 (6th Cir. 2020).

Deputies Gregory and Walsh maintain that they are entitled to qualified immunity. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 275 (6th Cir. 2020) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). We may pick which prong to consider first. *Id.* Here, we opt to start with whether the asserted violation of Mr. Huelsman's rights was clearly established at the time.

"A right is clearly established for purposes of overcoming the qualified immunity defense only when 'existing precedent [has] placed the statutory or constitutional question beyond debate,' although we do not require 'a case directly on point.'" *Id.* (alteration in original) (quoting *al-Kidd*, 563 U.S. at 741). So, Deputies Gregory and Walsh "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [their] shoes would have understood that he was violating it." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)).

The Huelsmans assert that the state-created-danger exception itself defines the clearly established right at issue: the Due Process Clause limits affirmative state actions that violate rights, and "[i]f there was an 'affirmative act by the state which either created or increased the risk' to the plaintiff . . . and a sufficiently culpable state of mind . . . then that rule has been violated." (Appellants' Br. at 21 (quoting *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1065 (6th Cir. 1988)). In return, the Deputies argue that "[t]he particularized law at issue here is whether a police officer can be found liable under the state created danger theory when they respond to a 911 call and the individual ultimately commits suicide." (Appellees' Br. at 17)

The Supreme Court has cautioned courts "'not to define clearly established law at a high level of generality,' since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff*, 572 U.S. at 779

(citation omitted) (quoting *al-Kidd*, 563 U.S. at 742)). The Deputies' conception is too vague, eliding many possible events between when an officer "respond[s] to a 911 call" and when "the individual ultimately commits suicide." Instead, we formulate the "clearly established" question here as follows: by the time of the September 19, 2015 events at issue, was the law clearly established that it was unconstitutional to take affirmative actions that created or increased the risk of a person's suicide when the person was not in official custody? *See Plumhoff*, 572 U.S. at 779.

The Fourteenth Amendment's Due Process Clause does not explicitly "require[] the State to protect the life, liberty, and property of its citizens against invasion by private actors." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). Our decisions, however, have delineated an exception to this rule in which state actors do have that responsibility.[1] *Schroder v. City of Fort Thomas*, 412 F.3d 724, 727–28 (6th Cir. 2005). In the "state-created-danger exception"—"where a State creates a perilous situation that renders citizens more vulnerable to danger at the hands of private actors"—"a plaintiff may bring a substantive due process claim by establishing (1) an affirmative act by the State that either created or increased the risk that the plaintiff would be exposed to private acts of violence; (2) a special danger to the plaintiff created by state action, as distinguished from a risk that affects the public at large*;* and (3) 'the requisite [state] culpability to establish a substantive due process violation.'"[2] *Id.* at 728 (alteration in original) (citations omitted) (quoting *Ewolski v. City of Brunswick,* 287 F.3d 492, 510 (6th Cir. 2002)). The third factor requires "'deliberate indifference' by the government entity when the entity 'had time to deliberate on what to do.'" *Id.* (quoting *Bukowski v. City of Akron,* 326 F.3d 702, 710 (6th Cir. 2003)).

---

[1]In *DeShaney* itself, the Supreme Court identified the other exception: "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." 489 U.S. at 199–200. This exception applies when "the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs." *Id.* at 200. Appellants do not argue on appeal that Mr. Huelsman was in custody for the purposes of this exception.

[2]Concerning the first factor, some of our discussions of the state-created-danger exception speak in terms of the plaintiff's exposure to an increased risk of violence specifically from a third party. *See, e.g.*, *Koulta v. Merciez*, 477 F.3d 442, 445 (6th Cir. 2007). The question of what was clearly established law for purposes of this case directly implicates this potential ambiguity. Because we determine that the law applying in this case was not clearly established at the time of the events, we need not discuss this issue further.

The most germane of our cases is an unpublished decision, *Cutlip v. City of Toledo*, 488 F. App'x 107 (6th Cir. 2012). There, police responded to a 911 call by Cutlip, who was evincing "erratic and paranoid behavior" and who they knew to be armed. *Id.* at 109. Over the course of a standoff lasting several hours, the police tried a variety of tactics to disarm Cutlip, from negotiation to flash-bang grenades. *Id.* at 109–11. Cutlip ultimately shot himself. *Id.* at 110–11. Explaining that "a situation where the victim committed suicide does not fit neatly into the state-created-danger doctrine," we noted that we had "never found liability under the state-created-danger doctrine where the victim committed suicide." *Id.* at 115. And we expressed some skepticism that "this exception applies to cases . . . where the victim committed suicide despite efforts by the police to prevent it." *Id.* But we then analyzed Cutlip's state-created-danger-based claims, drawing an inference in his favor (per the summary judgment review standard) about whether Cutlip intentionally pulled his gun's trigger. *Id.* at 117. Under the assumption that the only issue was "whether an 'affirmative act' by the police officers increased the risk that [Cutlip] would kill himself," we acknowledged the parties' agreement that Cutlip "was specifically at risk and that the police officers knew that he was at risk" and we reached a fact-specific determination of no liability. *Id.*

Nearly three years after *Cutlip*, and shortly before the events in this case, we addressed a similar claim in another unpublished opinion, *Jahn v. Farnsworth*, 617 F. App'x 453 (6th Cir. 2015). Jahn's son, a high-school student, had been disciplined by school officials. *Id.* at 454–56. He later "committed suicide off of school grounds after being released into his parents' custody" by the officials. *Id.* at 464. We held that the state-created-danger exception did not apply on these facts—in particular, because after the officials' discipline, the student "remained home under parental or grandparental supervision for several hours without incident" and without the officials present. *Id.*; *see also Garrett v. Belmont Cnty. Sheriff's Dep't*, 374 F. App'x 612, 618 (6th Cir. 2010) (finding no claim stated under the state-created-danger exception when a person committed suicide after release from state custody).

In both *Cutlip* and *Jahn*, we discussed the Tenth Circuit's decision in *Armijo ex rel. Chavez v. Wagon Mound Pub. Schs.*, 159 F.3d 1253 (10th Cir. 1998). *Cutlip*, 488 F. App'x at 115 & n.8; *Jahn*, 617 F. App'x at 463–64. In *Jahn*, we distinguished the facts from *Armijo*, in

which "school officials dropped off the student who was mentally unstable at his home without his parents being home to supervise him." 617 F. App'x at 464. The Tenth Circuit held that the officials were not entitled to qualified immunity, particularly because the officials "had some knowledge that might support an inference that Armijo was suicidal and distraught, was unable to care for himself, was home alone, and at least some of [them] knew Armijo had access to firearms." *Armijo*, 159 F.3d at 1264. The Tenth Circuit later described *Armijo* as having "effectively but unremarkably extended application of the state-created danger theory to instances of suicide, undeniably another form of private violence." *Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909, 918 (10th Cir. 2012). While other circuits have rejected claims based on events similar to those in *Armijo*, they have considered the state-created-danger exception potentially applicable to suicide in a noncustodial context involving adolescent students. *See, e.g.*, *Sanford v. Stiles*, 456 F.3d 298, 303–13 (3d Cir. 2006); *Martin v. Shawano-Gresham Sch. Dist.*, 295 F.3d 701, 707–12 (7th Cir. 2002); *Hasenfus v. LaJeunesse*, 175 F.3d 68, 70–74 (1st Cir. 1999).

The district court considered our decision in *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460 (6th Cir. 2006), to be "most instructive." *Wilson*, 491 F. Supp. 3d at 312. In *McQueen*, a student brought a gun to school and shot his classmate while their teacher was outside the classroom. 433 F.3d at 462–63. We held that the teacher's leaving the classroom was not an affirmative act for purposes of the state-created-danger exception; instead, "[t]he danger to [the victim] was created by [the other student's] possession of a gun and [the victim's] presence in the classroom with [the other student]," "irrespective of [the teacher's] location." *Id.* at 466. In other words, "[i]f [the teacher] had been in the room, there is no guarantee that, upon seeing the gun, she would have gotten to [the student] in time to prevent the shooting." *Id.* *McQueen* distinguished these facts from situations described in other cases in which "if the police had done nothing, the plaintiff would have been in greater danger than that resulting from the officers' intervention" and those in which "if the police had done nothing, the plaintiff would have faced just as much danger as she in fact faced after the officers' actions." *Id.* (citing *Cartwright v. City of Marine City*, 336 F.3d 487, 492 (6th Cir. 2003); *Bukowski*, 326 F.3d at 709). The state-created-danger exception typically does not apply in those situations. *See id.*

The district court concluded:

> [B]ecause Mr. Huelsman was suicidal and had access to a gun before Deputies Gregory and Walsh arrived, the Court cannot conclude that the alleged affirmative actions increased the risk of Mr. Huelsman committing suicide. As in *McQueen*, had Deputies Gregory and Walsh not separated Mr. and Mrs. Huelsman, not called off the EMS unit, or not left Mr. Huelsman unsupervised there is no guarantee that they would have been able to prevent Mr. Huelsman from shooting himself.

*Wilson*, 491 F. Supp. 3d at 312–13.

*McQueen* appears inapposite here—the role of an elementary school teacher is very different from that of an armed sheriff's deputy. Deputies Gregory and Walsh's role as law enforcement officers involved the prevention of violence. They were trained and equipped to that end, specifically instructed how to respond to calls of mental health crises, including suicide risks. Certainly, there is "no guarantee" that a teacher "in a busy classroom" would be able to stop a student with a gun, *McQueen*, 433 F.3d at 466, but a different calculus applies when a trained and armed officer is involved. No matter the factual setting, however, *Schroder* sets out plaintiffs' burden in asserting state-created-danger claims, the relevant portion of which is to show only that the state actor's "affirmative act . . . either created or increased the risk" of harm. 412 F.3d at 728.

The key question, then, is "not whether the victim was safer *during* the state action, but whether he was safer *before* the state action than he was *after* it." *Cartwright*, 336 F.3d at 493. That action must be "an affirmative act"; "failure to act is not an affirmative act under the state-created danger theory." *Id.* In our cases following *Cartwright* and *McQueen*, "we have refined the test"; "[r]ather than focusing on the often metaphysical question of whether officer behavior amounts to affirmative conduct or not," we have instead focused on the part of *Cartwright*'s reasoning that asks "whether [the victim] was safer before the state action than he was after it." *Koulta v. Merciez*, 477 F.3d 442, 445–46 (6th Cir. 2007) (second alteration in original) (quoting *Cartwright*, 336 F.3d at 493).

What matters most at this stage of the qualified immunity inquiry is whether the link between the state-created-danger doctrine and fact patterns involving suicide by a person not in

official custody was clearly established at the time of the events here.  Our cases have considered suicide-related liability in the context of the state-created danger doctrine, and their application to this case raises questions, particularly about the conduct of Deputy Gregory.  The Huelsmans question why suicide should be treated differently than any other harm that state action creates or makes more likely.  But the fact remains that our cases have treated suicide differently. *Cutlip*, 488 F. App'x at 115; *Jahn*, 617 F. App'x at 463.  And we have not yet extended the state-created-danger exception to similar instances of suicide by someone not in official custody.  If "[t]he 'salient question' in determining if a defendant is entitled to qualified immunity is whether she had 'fair warning' that her conduct was unconstitutional," *Ouza*, 969 F.3d at 276 (quoting *Guertin v. State*, 912 F.3d 907, 932 (6th Cir. 2019)), then we cannot say that Deputies Gregory and Walsh had sufficient warning of the possible unconstitutionality of their conduct.  Under governing precedent, they are entitled to qualified immunity.  Therefore, we need not reach the issue of whether any conduct by the Deputies violated Mr. Huelsman's constitutional rights.

## C.  The ADA Claims against Deputy Gregory

The Huelsmans' complaint alleged that "Defendants intentionally discriminated against Mr. Huelsman or failed to provide him a reasonable accommodation when they prevented him from being protected from acting on his suicidal ideations," violating the ADA.  (R. 1 at PageID 12)  The Huelsmans later and on appeal pursued only the failure-to-accommodate claim—that Mr. Huelsman "was denied a reasonable accommodation when Deputy Gregory called off the EMS unit." *Wilson*, 491 F. Supp. 3d. at 316.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  "Two types of claims are cognizable under Title II: claims for intentional discrimination and claims for a reasonable accommodation." *Roell v. Hamilton County*, 870 F.3d 471, 488 (6th Cir. 2017).  As to the latter, which the Huelsmans raise, "[a] regulation implementing Title II requires a public entity to make 'reasonable modifications' to its 'policies, practices, or procedures' when necessary to avoid . . . discrimination" based on disability. *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 749 (2017) (quoting 28 C.F.R.

§ 35.130(b)(7) (2016)). In other words, "Title II imposes affirmative obligations on public entities and does not merely require them to refrain from intentionally discriminating against the disabled." *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 910 (6th Cir. 2004). Those obligations apply to "virtually everything a public entity does," *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998), but the "determination of what constitutes reasonable modification is highly fact-specific, requiring case-by-case inquiry," *Roell*, 970 F.3d at 489 (quoting *Anderson v. City of Blue Ash*, 798 F.3d 338, 356 (6th Cir. 2015)). And "overriding public safety concerns" can render the proposed accommodations unreasonable. *Roell*, 970 F.3d at 489 (quoting *Tucker v. Tennessee*, 539 F.3d 526, 536 (6th Cir. 2008)).

Even if we assume that the ADA could apply in this situation, Deputy Gregory did not violate it. The parties agree that Mr. Huelsman lived with bipolar disorder, a disability for ADA purposes. The services at issue were those provided by EMS and those provided by Mobile Crisis, the benefits of which the parties frame differently. We see the benefit at issue as mental health treatment by Clermont County personnel. Thus, the district court reasonably concluded on this record that Deputy Gregory's decision to summon Mobile Crisis was a better way to provide that benefit because Mobile Crisis personnel were specifically trained in mental health treatment. *See Wilson*, 491 F. Supp. 3d at 318. If the benefit at issue is immediate but limited mental health evaluation by Clermont County personnel, the district court also reasonably concluded that "Deputies Gregory and Walsh were trained to provide the exact accommodation that Plaintiffs claim the EMS unit could have offered." *Id.* Either way, the record does not establish a dispute of material fact that Mr. Huelsman was denied the benefits of Clermont County's services, and so the district court did not err in granting summary judgment to Deputy Gregory on the Huelsmans' ADA claims.[3]

---

[3]We do not reach the issue of whether the district court erred in adopting the test articulated in *Moore v. City of Berkeley*, No. 14-CV-00669-CRB, 2018 WL 1456628 (N.D. Cal. Mar. 23, 2018). We note, however, that the Ninth Circuit has never approved *Moore*'s test, nor has any other circuit adopted it.

**D. The State Law Tort Claims against Deputies Gregory and Walsh**

Finally, the district court dismissed the Huelsmans' claims for wrongful death under Ohio Rev. Code § 2125.02, intentional infliction of serious emotional distress, and negligent infliction of emotional distress. *Wilson*, 491 F. Supp. 3d at 319. Deputies Gregory and Walsh have claimed statutory immunity. Ohio law provides state employees immunity unless they act "with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6)(b). This standard applies to sheriff's deputies. *Argabrite v. Neer*, 75 N.E.3d 161, 164 (Ohio 2016). The Huelsmans now challenge the district court's determination that Deputies Gregory and Walsh are entitled to statutory immunity because they did not act in a "wanton or reckless manner."

Initially, we note that "[w]hen federal qualified immunity and Ohio state-law immunity under § 2744.03(A)(6) rest on the same questions of material fact, we may review the state-law immunity defense 'through the lens of the federal qualified immunity analysis.'" *Downard ex rel. Downard v. Martin*, 968 F.3d 594, 602 (6th Cir. 2020) (quoting *Hopper v. Plummer*, 887 F.3d 744, 759 (6th Cir. 2018)). But in this case, our federal qualified immunity analysis turns on the "clearly established" prong. As a result, "the availability of both federal qualified immunity and state law immunity" does not entirely "depend[] on the correctness of the district court's finding of the existence of the very same questions of fact" because Ohio statutory immunity does not turn on whether a particular right was clearly established. *Chappell v. City of Cleveland*, 585 F.3d 901, 907 n.1, 916 n.3 (6th Cir. 2009). Whether this record shows that Deputies Gregory and Walsh's actions constituted a violation of particular federal constitutional rights under § 1983 is a substantially different question than whether they (and particularly Deputy Gregory) acted with malicious purpose, in bad faith, or in a wanton or reckless manner as Ohio law uses those terms. The latter is the appropriate inquiry when analyzing the Huelsmans' Ohio law claims.

Under Ohio law, "[w]anton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Anderson v. City of Massillon*, 983 N.E.2d 266, 273 (Ohio 2012). A person "acts in a reckless manner if he displays 'conscious disregard of or indifference to a known or obvious risk

of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct.'" *Downard*, 968 F.3d at 602 (quoting *Argabrite*, 75 N.E.3d at 164). Ohio law does not require a showing or finding that a person had actual, subjective knowledge of a known or obvious risk of harm to conclude that he acted recklessly. *Goodwin v. City of Painesville*, 781 F.3d 314, 334–35 (6th Cir. 2015). Instead, the person "can be found to be reckless either based on his actual knowledge of a risk of harm or under an objective standard (that the risk is 'obvious')." *Id.*

Ohio law also specifies that "[w]antonness and recklessness are 'different and distinct degrees of care and are not interchangeable.'" *Id.* at 334 (quoting *Anderson*, 983 N.E.2d at 273). Crucially, "[t]hough wantonness requires awareness of a given risk, recklessness does not." *Id.* "Taken together, this standard requires far more than mere negligent or careless conduct. It requires either intentional wrongdoing or a total disregard of a clear risk of harm." *Jones v. City of Elyria*, 947 F.3d 905, 920 (6th Cir. 2020). Still, "whether particular acts demonstrate the presence of wantonness, recklessness, or merely negligence is normally a decision for the jury, based on the totality of the circumstances." *Chesher v. Neyer*, 477 F.3d 784, 804 (6th Cir. 2007) (quoting *Whitfield v. City of Dayton,* 854 N.E.2d 532, 540 (Ohio Ct. App. 2006)).

The decision below quoted our unpublished opinion in *Ruiz-Bueno v. Scott*, 639 F. App'x 354, 365 (6th Cir. 2016), concluding that "where a reasonable juror could not find that officers acted with deliberate indifference, 'there is insufficient evidence to find that they acted with malicious purpose, in bad faith, or in a wanton or reckless manner.'" *Wilson*, 491 F. Supp. 3d at 319. The Supreme Court has considered deliberate indifference "to a substantial risk of serious harm" to be "the equivalent of recklessly disregarding that risk." *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). Under this interpretation, though, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. It is "consistent with recklessness in the criminal law." *Id.*

This equivalency with deliberate indifference, however, differs from Ohio law after *Anderson*, which does not require awareness of the risk. *See Goodwin*, 781 F.3d at 334–35. *Anderson* expressly departed from "the definition for reckless found in criminal law" by specifying that the risk could be "known *or obvious*." 983 N.E.2d at 384, 388 (emphasis added).

And in doing so, *Anderson* stepped away from the terminology preferred in earlier cases—that "recklessness is the perverse disregard of a known risk." *Id.* at 384; *see O'Toole v. Denihan*, 889 N.E.2d 505, 517 (Ohio 2008). Our decision in *Ruiz-Bueno*, moreover, did not cite *Anderson* and predated *Argabrite*, the two key Ohio Supreme Court decisions clarifying the mental states included in Ohio Rev. Code § 2125.02. *See* 639 F. App'x at 365. So too for *Stefan v. Olson*, 497 F. App'x 568, 580–81 (6th Cir. 2012), upon which the decision below also relied.

In light of *Anderson* and *Argabrite*, the concept of "deliberate indifference" as defined in *Farmer* is not equivalent to Ohio's definition of recklessness, even if it may be roughly equivalent to Ohio's separate definition of wantonness. Under Ohio Rev. Code § 2125.02, a plaintiff must show only that the official acted in a reckless *or* wanton manner, not both. So, a plaintiff's failure to show that an official was aware of the risk of harm does not automatically lead to immunity in Ohio because the official's conduct may still be reckless. Generally, a district court abuses its discretion by applying an incorrect legal standard. *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 625 (6th Cir. 2016). And here, we review the district court's application of state law de novo, a less deferential standard than abuse of discretion. *See Troutman*, 979 F.3d at 482. By conflating deliberate indifference and recklessness under Ohio law, the district court applied an incorrect legal standard and thus erred—a conclusion our colleague's separate writing does not dispute.

Where we and our colleague part ways is regarding that error's significance. We believe this error mattered because the record reveals genuine disputes of material fact concerning whether Deputies Gregory and/or Walsh acted recklessly. The decision below concluded that "although they arguably <u>could</u> have drawn the influence that Mr. Huelsman was suicidal[,] Deputies Gregory and Walsh <u>did not</u> draw the inference that Mr. Huelsman was suicidal." *Wilson*, 491 F. Supp. 3d at 314. Again, however, Deputies Gregory and/or Walsh need not have actually drawn that inference—that is, have been aware of the risk of Mr. Huelsman's suicide— to have acted recklessly under Ohio law. And drawing all reasonable inferences from the record in the Huelsmans' favor, as we must on a motion for summary judgment against them, a reasonable juror could find that Deputies Gregory and/or Walsh acted recklessly. There is significant evidence in the record the import of which is genuinely disputed: the information the

Deputies received from the dispatcher, the value of the EMS personnel's ability to assess a person's mental health condition and make a recommendation to a deputy, Mrs. Huelsman's exhortations not to leave Mr. Huelsman alone, her statements that there were some number of guns in the house (believed to be secured or otherwise), Mr. Huelsman's statements about his health and his psychiatrist's care, his statement that "if I ever killed myself you couldn't make it because you can't afford the house," Deputy Walsh's decision to leave the scene, Deputy Gregory's statement to Mobile Crisis that dispatch and Mrs. Huelsman said Mr. Huelsman was suicidal, and Deputy Gregory's decisions to call off EMS and wait for nine minutes in his car, among others. A reasonable juror could conclude from some combination of these indicia that the risk of Mr. Huelsman's suicide was indeed obvious and that Deputies Gregory and/or Walsh acted recklessly as a result. It may well be that when presented with this case, a jury would conclude Deputies Gregory and/or Walsh did not act recklessly on the rationales that the separate writing discusses. But on this record and given Ohio courts' strong preference for a jury to determine whether particular acts or decisions demonstrate recklessness, the grant of statutory immunity to Deputies Gregory and Walsh, and therefore the grant of summary judgment in their favor on the Huelsmans' state law claims, was also error.

## III. CONCLUSION

For these reasons, we **AFFIRM** the decision below as to the Huelsmans' § 1983 and ADA claims and **VACATE** it as to their state law claims against Deputies Gregory and Walsh. We **REMAND** the state law claims to the district court to determine whether to exercise supplemental jurisdiction over them, *see generally Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009), and in the event it chooses to do so, for further proceedings consistent with this opinion.

---

**CONCURRENCE**

---

JANE B. STRANCH, Circuit Judge, concurring.  I write separately to address two additional concerns.  Neither is strictly necessary to our decision, but I believe both call for our attention.

A.

The first is Defendants' repeated descriptions of Mrs. Huelsman as "hysterical," which apparently refer to Deputy Gregory's phrasing.  "In the linguistic history of our society, it is common to find women referred to as hysterical; it is uncommon to find references to hysterical men." *McKee v. City of Rockwall*, 877 F.2d 409, 425 (5th Cir. 1989) (Goldberg, J., concurring in part).  These "stereotypes are not easy to undo." *Id.*  Certainly, Mrs. Huelsman was upset.  But I agree with Judge Goldberg's characterization of responses like hers as "extremely rational and understandable" considering Mrs. Huelsman's concern for the safety of her husband and her well-founded fear that if "the police stood by and did nothing to protect" him, he would commit suicide. *Id.*  While Deputy Gregory and the other Defendants may not have intended to invoke "archaic and stereotypical" notions of women as irrationally and undesirably emotional, the fact remains that the word "hysterical" has generally carried those connotations—particularly when used to describe an upset woman, as it was here.  *Id.*; *see generally* Jane M. Ussher, *The Madness of Women: Myth and Experience* 8–12, 68 (2011).  I remark upon this term not only to encourage reflection on the import and not-so-hidden meanings of the words we choose but because Deputy Gregory's description of Mrs. Huelsman specifically as "hysterical" tells us something useful about how he evaluated Mrs. and Mr. Huelsman's respective demeanors.  This case also tells us something useful about the harm that can flow from these kinds of unconscious or unconsidered conclusions.

B.

My second concern lies with the district court's application of the state-created-danger exception.  Our opinion rests on the finding that the applicable law was not clearly established at

the level of generality that the Supreme Court has instructed is appropriate.  But I note that the state-created-danger exception itself was clearly established and, in my view, the district court erred in applying it.  The record "shows that the danger of Mr. Huelsman committing suicide existed before the conduct at issue." *Wilson v. Gregory*, 491 F. Supp. 3d 299, 312 (S.D. Ohio 2020).  So, the district court was correct to reason that the Deputies did not create that danger. *See Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003) (explaining that a plaintiff must show "an affirmative act by the state which either created or increased the risk"). But the court failed to consider the second part of our test.  It did not analyze whether Deputy Gregory's choice to leave Mr. Huelsman alone in the house (a choice upon which the reviewing detective specifically remarked) increased the risk of his suicide; instead, it speculated that Deputy Gregory's choice made no difference.  *Wilson*, 491 F. Supp. 3d at 312; *see Cartwright*, 336 F.3d at 493.  That was not the court's decision to make.  That determination was properly within the province of a jury.  On this record, a reasonable juror could readily find that Deputy Gregory's approach to the situation and the decisions he made increased the risk Mr. Huelsman would commit suicide.  Courts analyzing a state-created-danger claim should, as our precedents state, scrutinize whether the state actor increased the risk to the plaintiff in addition to whether it created the risk in the first place.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

JOHN K. BUSH, Circuit Judge, concurring in part and dissenting in part. I agree with the majority's decision to affirm the district court's grant of summary judgment on the Huelsmans' § 1983 and ADA claims. I write separately because I disagree with the majority's decision to vacate the district court's grant of state-law immunity to Deputies Gregory and Walsh. I would affirm.

Ohio law provides state employees with immunity unless they act "with malicious purpose, bad faith, or in a wanton or reckless manner." Ohio Rev. Code. § 2744.03(A)(6)(b). Mr. Heulsman's estate argues only that the deputies acted in a reckless manner. A person acts in a reckless manner if he or she displays "conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson v. City of Massillon*, 983 N.E.2d 266, 273 (Ohio 2012); *see also Downard ex rel. Downard v. Martin*, 968 F.3d 594, 602 (6th Cir. 2020). Recklessness is a "rigorous standard[] that will in most circumstances be difficult to establish." *Argabrite v. Neer*, 75 N.E.3d 161, 164 (Ohio 2016). And although a determination of recklessness is typically within the province of the jury, "summary judgment is proper under certain facts," especially considering that "the standard for demonstrating such conduct is high." *Vidovic v. Hoynes*, 29 N.E.3d 338, 348 (Ohio Ct. App. 2015) (quoting *Winkle v. Zettler Funeral Homes, Inc.*, 912 N.E.2d 151, 158 (Ohio Ct. App. 2009)). This is such a case.

It is undisputed that the deputies reported to the Huelsmans' residence with the understanding that Mr. Huelsman was an older man exhibiting abnormal behaviors, who might be violent and have access to weapons, but that he was not violent at the time.[1] On arrival, the deputies were welcomed inside the residence and spoke to both Mr. and Mrs. Huelsman. Deputy

---

[1] As the majority recognizes, there is some dispute as to whether the deputies knew more. The estate claims that the deputies were told that Mr. Huelsman was suicidal, and that he was bipolar, in addition to the facts mentioned above. Even assuming that were true, the deputies did not act in a reckless manner. Thus, the factual dispute is not material. The rest of the facts are not in dispute.

Gregory asked the couple what was going on. Mrs. Huelsman emotionally explained that Mr. Huelsman had accused her of playing political talk radio outside his door, taking his keys and wallet, hiding all of his guns, and messing up his phone and tablet. On hearing this, Mr. Huelsman became agitated at Mrs. Huelsman, so Gregory asked Mrs. Huelsman to step outside. That is when Mrs. Huelsman told Gregory that Mr. Huelsman was suicidal, should not be left alone, and needed to go to the hospital. Mr. Huelsman overheard Mrs. Huelsman and responded: "All I said was that if I killed myself, you wouldn't be able to afford the house." Mrs. Huelsman confirmed that that lone statement was the reason she thought Mr. Huelsman was suicidal. She also told the deputies that all of the guns had been hidden or locked away.[2] Gregory then determined that he was dealing with a domestic situation, and so he dismissed EMS and moved Mrs. Huelsman further from the house to speak with Deputy Walsh.

With Mrs. Huelsman removed from the area, Gregory re-entered the house to speak with Mr. Huelsman alone. Mr. Huelsman told Gregory that Mrs. Huelsman was the one with the problem because she was inexplicably trying to get him out of the house. He said that he was also upset about her hiding all of his guns, taking away his driver's license and keys, and he informed Gregory that he had terminal cancer. The two then had a personal conversation about the difficulties of cancer treatment (Gregory had lost his father to cancer), and Mr. Huelsman told Gregory that Mrs. Huelsman was his nurse.[3] After that conversation, Gregory left the house to discuss the situation with Walsh, and to contact his supervisor and the Mobile Crisis Team to determine next steps. Gregory then went back inside, told Mr. Heulsman he had called the Mobile Crisis Team, and then went to his car to take a follow up call with the Team and to fill out paperwork. About nine minutes later—while Gregory was still in his car, and after Walsh had left the scene to respond to another emergency—Mr. Huelsman shot himself.

---

[2]The majority mentions that Mrs. Huelsman also told Deputy Walsh that her husband "was sleeping with a gun under his pillow." Maj. at 7. But later in the conversation, Mrs. Huelsman reassured Walsh that "all of the guns had been hidden or locked away." It was objectively reasonable for Walsh to credit Mrs. Huelsman's latter assurance. And although we do not consider information revealed after the fact in our analysis, it is worth pointing out that in her deposition, Mrs. Huelsman said that she did not find Mr. Huelsman sleeping with a gun under his pillow on the relevant date, September 19, 2015. She found the guns under his pillow on two other occasions, once in 2013 and once in 2014—she subsequently hid both guns.

[3]The deputies had no knowledge, however, of Mrs. Huelsman's professional background as an oncology nurse or of her experience as a hospice nurse.

Mr. Huelsman's suicide was truly unfortunate, but we must evaluate the above circumstances "without the benefit of . . . hindsight." *O'Toole v. Denihan*, 889 N.E.2d 505, 517 (Ohio 2008). Much like the defendants in *Estate of Smith v. Western Brown Local School District.*, who gathered information, and then reasonably assessed the nature of a student's suicidal threats before ultimately contacting his parents, the deputies here did not fail to exercise care in regard to the deceased. 26 N.E.3d 890, 901–02 (Ohio Ct. App. 2015) (finding defendant's conduct not reckless under Ohio law). They spoke at length with Mr. and Mrs. Huelsman, made an objectively reasonable assessment of the situation, and contacted the Mobile Crisis Team.

Specifically, the deputies were not outside the bounds of reason to conclude that they were dealing with a domestic dispute, rather than an imminent suicide risk. Nor was it unreasonable for them to determine that, if there were any guns in the house, they had been hidden or locked away from Mr. Huelsman. Both Mr. and Mrs. Huelsman told them as much. The worst that might be said about Deputy Gregory is that he was negligent for leaving Mr. Huelsman alone in the home for nine minutes. *See Crampton v. Kroger Co.*, 162 N.E.2d 553, 559 (Ohio Ct. App. 1959) (defining negligent conduct as the "failure to exercise that degree of care which an ordinarily careful and prudent person would exercise under the same or similar circumstances"). Clearly, in hindsight, Gregory misjudged the immediacy of the suicide risk. But it was not reckless for the deputy at the time to conclude that Mr. Huelsman lacked the will and means to kill himself while left alone, given all of the information gathered from interviewing and observing the Huelsmans.

As for Gregory's decision to dismiss the EMS, that too was, at most, negligent. The majority even suggests that it was entirely proper. *See* Maj. at 17 (approving of the district court's conclusion that "Deputy Gregory and Walsh were trained to provide the exact accommodation that Plaintiffs claim the EMS unit could have officered"). At bottom, no reasonable jury could find that Gregory's conduct was "substantially greater" than negligent. *See Anderson*, 983 N.E.2d at 273. The same is true for Walsh's decision to leave the scene to respond to an emergency up the street involving an individual who had stopped breathing.

In reaching the opposite conclusion, the majority engages in hindsight bias.  It also fails to sufficiently recognize that recklessness is a "rigorous" standard under Ohio law.  *Argabrite*, 275 N.E.3d at 164.  But the facts we must consider do not include everything we know now; rather, they include only what the deputies knew then.  *See O'Toole*, 889 N.E.2d at 517.  And we are to accord full weight to Ohio's standard of recklessness.  *See Estate of Smith*, 26 N.E.3d at 901 ("Although [Plaintiff's] death was tragic and an immense loss, that tragedy does not mean the standard for showing . . . recklessness is any less.").

Police officers face difficult situations and serious risks on a daily basis.  We should refrain from lowering the protections Ohio reasonably chose for its officers.  Of course, a reasonable jury might conclude that Deputy Gregory made a mistake by leaving Mr. Huelsman alone in his home.  It might even conclude that he or Welsh was negligent for other decisions they made.  But that is not enough for recklessness under Ohio law.  *See Anderson*, 983 N.E.2d at 273.  Based on the facts that were known to the deputies, I do not believe that any reasonable jury could find that the deputies' conduct was reckless.  I would thus affirm on all grounds.